[No. E042229. Fourth Dist., Div. Two. July 21, 2009.]

THE HABITAT TRUST FOR WILDLIFE, INC., Plaintiff and Appellant, v. CITY OF RANCHO CUCAMONGA et al., Defendants and Respondents; SPS DEVELOPMENT SERVICES, INC., et al., Real Parties in Interest and Respondents.

[Nos. E043925, E044797. Fourth Dist., Div. Two. July 21, 2009.]

THE HABITAT TRUST FOR WILDLIFE, INC., et al., Plaintiffs, Cross-defendants and Appellants, v.
SPS DEVELOPMENT SERVICES, INC., et al., Defendants and Respondents;
HENDERSON CREEK PROPERTIES, LLC, Defendant, Cross-complainant and Respondent.

## COUNSEL

The Law Office of Craig A. Sherman and Craig A. Sherman for Plaintiff and Appellant and for Plaintiffs, Cross-defendants and Appellants.

Richards, Watson & Gershon, Mitchell E. Abbott and Ginetta L. Giovinco for Defendants and Respondents City of Rancho Cucamonga and City Council of the City of Rancho Cucamonga.

Manatt, Phelps & Phillips, Alan J. Kessel, Keli N. Osaki; Law Offices of Judith B. Oakes and Judith B. Oakes for Defendant and Respondent SPS Development Services, Inc., and for Defendant, Cross-complainant and Respondent.

Jackson, DeMarco, Tidus & Peckenpaugh, Michael L. Tidus and Daniel A. Friedlander for Defendants and Respondents Rancho 2004, LLC, Granite Homes of California, Inc., Granite Homes, Inc., and Granite Construction Services, LP.

Allen Matkins Leck Gamble Mallory & Natsis, Stephen R. Thames, Brian R. Bauer; Ruth E. Stringer, County Counsel, and Mitchell L. Norton, Deputy County Counsel, for Defendant and Respondent County Service Area 70, Improvement Zone OS-1.

Davis & Rayburn and Thomas P. Davis, for Defendant and Respondent Brody McFarland.

## OPINION

**MILLER, J.**—Plaintiff, The Habitat Trust for Wildlife, Inc. (Habitat), appeals from a judgment in favor of defendants City of Rancho Cucamonga and city council of the City of Rancho Cucamonga (sometimes City Council otherwise, collectively City) on its petition for writ of mandate. By its petition Habitat sought to force City to set aside a resolution determining that Habitat is not a qualified conservation entity (QCE) and to enter a new resolution based upon substantial evidence and in compliance with California law. Habitat argues that the petition was wrongfully denied by the trial court because it employed the wrong standard of review, because City denied

Habitat due process, because City's criteria for determining what was a QCE were vague and uncertain and conflicted with federal and state law, and because City's findings in support of its resolution were not supported by the evidence before it.

In a second, related case, plaintiffs Habitat and Spirit of the Sage Council, Inc. (Sage, collectively Habitat/Sage), appeal from a judgment entered in favor of defendants Henderson Creek Properties, LLC (Henderson), SPS Development Services, Inc. (SPS, collectively Henderson/SPS), Rancho 2004, LLC, Granite Homes of California, Inc., Granite Homes, Inc., Granite Construction Services, LP (collectively Granite), and County Service Area 70, Improvement Zone OS-1 (hereinafter sometimes, County) after their motions for summary judgment were granted. Habitat/Sage sought damages for breach of contract, breach of the covenant of good faith and fair dealing and constructive trust. They claim that the trial court erred in granting summary judgment because it exceeded its authority by invading the province of the trier of fact, made findings unsupported by fact or law, improperly struck most of their evidence, failed to consider reasonable inferences that supported a triable issue of material fact and failed to give effect to the contract's savings clause. Habitat/Sage also challenge the judgment insofar as it was entered against them on Henderson's cross-complaint for rescission.

In the third appeal Habitat/Sage challenge the postjudgment order awarding Henderson/SPS and Granite their attorney fees and costs. In their opening brief they expressly state that their challenge to these orders is based solely upon their claim that the underlying judgment should be reversed.

We affirm the challenged judgments and orders.

## FACTUAL AND PROCEDURAL HISTORY

Henderson sought to develop 65.3 acres of land within the sphere of influence of City into a residential subdivision to be annexed to the City.[2] The draft environmental impact report (EIR) proposed that Henderson convey 58 acres of off-site land to San Bernardino County Special District OS-1 (County Special District) in order to mitigate the potential loss of habitat for sensitive plant and animal species and the loss of raptor foraging land caused by the project. Sage, a nonprofit environmental advocacy group, opposed the project on the grounds that the mitigation required in the draft EIR was inadequate to protect the environment. Sage suggested that Henderson donate mitigation lands to Habitat, a tax-exempt nonprofit land trust created by Sage to own three parcels of mitigation land obtained through litigation over

---

[2] The Henderson Creek Development Project (Henderson project).

earlier City-approved projects. The final EIR, issued April 30, 2004, required that Henderson transfer a minimum of 54 acres of off-site mitigation land for permanent habitat conservation to "the County of San Bernardino Special District OS-1 or other qualified conservation entity approved by the City . . ." along with funding to maintain the land, and responded to the other concerns in Sage's letter of objections. The staff report for the planning commission stated that the open space transfer for the project allowed the property owner to select an appropriate nonprofit entity, other than the County Special District, to receive the mitigation land, subject to City planner approval. On May 12, 2004, Sage wrote to City's planning commission that it was concerned the final EIR was not specific enough with regards to what entity would receive the mitigation lands for the Henderson project. The EIR was approved by resolution of the planning commission requiring the property owner to "transfer to the County of San Bernardino Special District OS-1 or other qualified conservation entity approved by City, in fee, a minimum of 54-acres of off-site land for permanent open space and habitat preservation; along with funding in an amount to be mutually agreed upon by the property owner and the conservation entity, to provide for long-term maintenance of said land."

Sage and Habitat appealed the resolution of the planning commission and informed the mayor and the City Council that they did not agree with the final EIR, which they found deficient in a number of respects. At its meeting on June 16, 2004, the City Council certified the final EIR, denied the appeal of the planning commission resolution, and approved other resolutions related to Henderson's project. The resolution approving the tentative tract map contained the same land transfer mitigation as required by the planning commission, as quoted above.

City and Henderson entered a development agreement dated July 7, 2004. The agreement provided that "[t]he the City shall not be prevented, in subsequent actions applicable to the Project, from applying new ordinances, rules[,] regulations and policies" so long as they do not conflict with laws existing at the time the agreement was entered. The agreement mirrored the final EIR in that it further provided, "[t]he Property Owner shall transfer to the County of San Bernardino Special District OS-1 or other qualified conservation entity approved by the City, in fee, a minimum of 54-acres of off-site land for permanent open space and habitat preservation; along with funding in an amount to be mutually agreed upon by the Property Owner and the conservation entity, to provide for long-term maintenance of said land." In addition, with respect to future entitlements (which included all of the conditions and mitigation measures stated in the resolutions of approval made by the planning commission and the City Council) City specifically retained its discretionary review authority. The agreement was specifically made enforceable by the parties. Further, it provided that "[w]here the consent or

approval of any of the Parties is required in or necessary under [the development agreement], unless the context otherwise indicates, such consent or approval shall not be unreasonably withheld."

In July and August 2004, Sage filed three petitions for writ of mandate against City based upon its certification of documents required by the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) on three residential development projects. However, in order to prevent a CEQA challenge to the Henderson project based upon inadequate mitigation of environmental impacts, Henderson, Sage and Habitat entered into an agreement, dated July 18, 2004 (Agreement). Henderson agreed to convey a specified parcel of real property consisting of 86 acres to Habitat for conservation purposes, along with providing gates, fences and barriers in an amount not to exceed $15,000, plus $100,000 for administration costs, $25,000 for attorney fees and an endowment of $430,750 ($5,000 per acre for 86.15 acres). It also agreed to let Habitat onto the property to be developed to collect plantlife for conservation purposes prior to grading. Habitat and Sage agreed to withdraw the objections to the Henderson project that they had lodged with the City, agreed not to challenge the EIR nor any of the required project approvals, and released Henderson and its assigns and successors from all claims arising out of or related to the Henderson project. The enumerated conditions to the close of escrow on the property to be conveyed to Habitat did not include its approval by City as a QCE. The Agreement was binding on all successors and assigns. The Agreement also stated that all provisions of the contract would remain in effect if any other provision was found illegal or unenforceable and should be interpreted as if mutually prepared.

On September 14, 2004, Larry Henderson, City's principal planner (Planner), asked a Henderson representative to submit a written proposal that Sage be approved as the receiving entity for the mitigation land, providing documentation on the qualifications of Sage and the reasons for its recommendation. On September 23, 2004, Henderson's representative requested that Habitat be approved as the QCE to receive the mitigation lands required by BIO-1 of the final EIR and attached copies of documents from Habitat's Web site, both describing its nature sanctuary in the area and the method by which it seeks donations, and a letter from the Internal Revenue Service, dated October 8, 2003, finding Habitat to be exempt from federal income taxation under Internal Revenue Code section 501(c)(3). In response, City informed Henderson's representative that the transfer plan would need to be approved by the City Council and listed nine items that would need to be submitted: (1) Habitat's incorporation papers, (2) its board of directors meeting minutes for the action approving acceptance of the transfer, (3) its bylaws, (4) its most recent auditor's report, (5) a copy of the habitat resource management plan for the nearest site currently owned by Habitat, (6) a list of its board

members, (7) a list of its office locations, (8) a list of all personnel that would be involved in management of the transfer plan and their qualifications, and (9) a proposed operations plan, including maintenance schedule.

On November 3, 2004, Granite sent City a letter informing it that Granite had acquired Henderson's interest in the Henderson project, and had forwarded the request for information about Habitat on to that entity, which had yet to respond. The letter also informed City that if for any number of reasons the transfer to Habitat did not take place, Granite would transfer property under mitigation BIO-1 to the County.

By December 10, 2004, Granite's representative informed City that Habitat believed documents it had already submitted addressed all of City's requirements and requested information regarding the further processing of the land transfer. On December 14, 2004, Planner informed Granite's representative that City still did not have all of the information requested on Habitat, including audited financial records, a land management plan, "etc., etc. . . ." Granite's representative responded that the letters that Habitat's attorney submitted with the materials provided to City explained how the information previously provided addressed those specific requests.

On January 5, 2005, Sage and Habitat filed a complaint against SPS and Henderson for breach of contract and fraud based upon their failure to transfer the land as required by the Agreement. The following day, City sent a letter to Granite's representative listing the nine items requested by City and outlining its concerns with the items where the responses on Habitat's behalf were deemed less than adequate. Granite's representative forwarded City's letter to Habitat on January 10, 2005. Habitat recorded a notice of pendency of action against four parcels on January 11, 2005.

On January 13, 2005, Habitat's attorney refused Granite's offer to allow it to process the land transfer application directly to City. He also forwarded to Henderson's attorney Habitat's response to items four through nine of City's list. He communicated directly with City by letter dated January 31, 2005, demanding that City provide Habitat with due process (notice and an opportunity to be heard) relating to City's decision to disqualify Habitat from receiving mitigation land in conjunction with the Henderson project, and requesting a continuance of the hearing scheduled for February 2, 2005. On February 2, 2005, Habitat provided City with an operations plan and annual work plan assessment for its currently managed nature sanctuaries. The agenda for the City Council meeting on the same date listed consideration of Granite's request to have City approve Habitat as the recipient of mitigation lands for the Henderson project. The staff report prepared by Planner recommended that City determine that Habitat had not demonstrated sufficient qualifications to have the mitigation land transferred to it. Specifically,

the report cited the absence of a sufficient auditor's report for Habitat to clearly reflect its compliance with annual audit requirements, the habitat resources management plan provided for the nearest site currently managed by Habitat was an unsigned draft containing blanks and without exhibits, a list of all board members had not been provided and none of the three listed were from the local area, a list of the trust officers had not been provided, a list of the personnel who would manage the land and a list of their qualifications had not been provided and Habitat indicated it relied on volunteers to conduct ongoing management responsibilities, and no proposed operations plan and maintenance schedule had been submitted. Staff concluded that the County would provide a more "complete and publicly accountable management entity."

At the February 2, 2005, meeting, the City Council voted to continue the item to its February 16, 2005, meeting in order to allow Planner to review the additional materials received from Habitat. Planner issued a staff report for the February 16, 2005, meeting, which again recommended that Habitat had not demonstrated sufficient qualifications to accept the land transfer for substantially the same reasons listed previously. On February 16, 2005, Habitat's counsel faxed City a letter challenging the conclusions reached in the staff report as well as the findings in support of the proposed resolution, and including additional attachments. At the meeting, Planner presented his report advising that he believed the County was "a more appropriate entity to receive the land" based upon its position as a "complete and publicly accountable management entity." The City Council was informed by the city attorney that as of February 11, 2005, Habitat was suspended as a California corporation. Habitat's attorney also addressed the City Council. The City Council unanimously adopted the resolution establishing criteria for the designation of conservation entities to manage open space habitat transfer lands and denying Granite's request to allow the transfer of mitigation lands for the Henderson project to Habitat. The criteria established to determine whether an entity was qualified to accept mitigation lands were: "a. The entity must have fulfilled the legal requirements necessary for the creation of the public or private entity. [¶] b. The entity must demonstrate sufficient capability in terms of resources, available staff, and offices to provide sufficient management of the land and to respond in a timely manner to issues that arise thereupon. [¶] c. The entity must have proposed a site-specific Habitat Resource Management Plan and an Operations Plan to ensure management and operation of the land in compliance with any applicable mitigations measures. [¶] d. The entity must be accountable to the members of the immediate community for the entity's management of the land."

In the meantime, on February 14, 2005, Granite filed a demurrer to the complaint for breach of contract based on the fact that satisfaction of mitigation condition BIO-1, which had yet to occur, was a prerequisite to a

binding contract between the parties, and that the causes of action were not pled with sufficient specificity. The demurrer was overruled. Granite filed its answer on May 2, 2005, alleging affirmative defenses of commercial frustration, failure of consideration, and that the allegations were contrary to the parties' intent, among others.

On February 18, 2005, Henderson/SPS filed their answer to the breach of contract complaint alleging the affirmative defenses of failure of consideration and commercial frustration among others, and also filed a cross-complaint for rescission based upon failure of consideration, mutual mistake and duress. Habitat/Sage's special motion to strike the cross-complaint under Code of Civil Procedure[3] section 425.16 was denied. They filed their answer to the cross-complaint on May 5, 2005.

Habitat filed a petition for writ of mandate under sections 1085 and 1094.5 on May 17, 2005, challenging City's determination that it was not a QCE for the purpose of receiving and managing land to mitigate the environmental impacts of projects within the City. On June 27, 2005, Habitat filed a first amended petition alleging that City's determination that Habitat was not a QCE was not supported by substantial evidence, but instead resulted from collusion between City and Henderson and/or Granite. It also contended that City acted contrary to law. City's decision allegedly prevented Habitat from conducting and growing its business and damaged Habitat's reputation as a land trust and thereby deprived it of a fundamental, vested right. In its memorandum of points and authorities filed May 18, 2006, Habitat argued that City unreasonably withheld its consent to approval of Habitat as a QCE despite an agreement with Henderson to the contrary, that City exceeded its authority in denying QCE status to Habitat under state and federal statutes, that City's hearing was arbitrary, unfair and capricious because its criteria were vague and because Habitat was not a part of the proceedings but instead had to rely on the project applicant who made false and inaccurate statements about Habitat's qualifications, and that City's findings were not supported by the evidence and some were not legally permissible. City filed an answer and responsive memorandum of points and authorities challenging Habitat's contentions regarding the proper standard of review and denying that any argument in the petition had merit.

On June 13, 2005, pursuant to motions by Henderson/SPS and Granite the trial court ordered the lis pendens recorded by Habitat expunged. Habitat/Sage's July 2005 application to file a second lis pendens and for attachment and protective orders was also denied.

---

[3] All further statutory references will be to the Code of Civil Procedure unless otherwise indicated.

As the result of a stipulation and order Habitat/Sage filed a first amended complaint for breach of contract on September 19, 2005, alleging breach of contract, breach of the covenant of good faith and fair dealing, constructive trust and unjust enrichment. The only copies of the first amended complaint contained in the record on appeal have no file stamp and state causes of action for breach of contract and fraud only. In addition, it appears from the trial court's remarks at a subsequent hearing that Cecil Johnson and County Service Area 70, Improvement Zone OS-1 were added as defendants to the first amended complaint. There are no documents that confirm these facts contained in the record on appeal.

Both Henderson/SPS and Granite filed demurrers and motions to strike. The demurrers concern the third cause of action for constructive trust and the fourth cause of action for unjust enrichment. On January 5, 2006, the trial court sustained the demurrers as to the third cause of action without leave to amend and as to the fourth cause of action with leave to amend. It also struck the allegations regarding specific performance from the complaint without leave to amend and struck those regarding Cecil Johnson's ownership of the land at issue with leave to amend. Habitat/Sage subsequently filed a notice of their election not to amend their first amended complaint, leaving only the causes of action for breach of contract and breach of the covenant of good faith and fair dealing as to moving defendants.

Granite and Henderson/SPS filed answers and County filed a demurrer to the breach of contract and constructive trust causes of action in the first amended complaint. The trial court entered a default against Cecil M. Johnson as trustee of the Cecil M. Johnson Family Trust (Johnson) on March 21, 2006. Later, it sustained County's demurrer to the first cause of action without leave to amend and to the third cause of action with leave to amend.

On April 11, 2006, Habitat/Sage filed the operative second amended complaint including causes of action for breach of contract and breach of the covenant of good faith and fair dealing against Henderson/SPS and Granite, and a cause of action for constructive trust against Johnson and County. Granite, Henderson/SPS and County answered. On June 23, 2006, Brody McFarland (McFarland) was substituted in as a defendant in place of Johnson, who had passed away. McFarland's demurrer to the second amended complaint was sustained without leave to amend. Habitat/Sage's subsequent motion to have McFarland substituted in as successor trustee in place of Johnson was granted and McFarland filed an answer to the second amended complaint.

While the status of the pleadings was being finalized in the contract action, after a hearing at which the trial court took the matter under submission, a

statement of decision was issued on September 28, 2006, denying Habitat's writ petition in its entirety. Judgment in favor of City was entered on November 9, 2006. Habitat thereafter filed its notice of appeal regarding the writ petition.

On January 29, 2007, Habitat/Sage filed a motion for summary adjudication of issues regarding certain of Henderson/SPS and Granite's affirmative defenses and Henderson/SPS's cross-complaint for rescission. While that motion was pending, County, Henderson/SPS, and Granite filed motions for summary judgment. On April 17, 2007, the trial court denied Habitat/Sage's motion for summary adjudication of issues in its entirety. After a hearing on June 5, 2007, the trial court granted all three motions for summary judgment. Pursuant to a stipulation and order filed on July 2, 2007, McFarland was dismissed from the action as if he had filed a motion for summary judgment on the same grounds as the moving parties. Judgment was entered in favor of the remaining defendants on July 2, 2007. Habitat/Sage then filed a notice of appeal. It also filed a motion to correct a clerical error in the judgment, which was denied.

The trial court granted in part and denied in part Habitat/Sage's motion to tax costs claimed by Henderson/SPS. Henderson/SPS and Granite then moved for attorney fees based upon a provision in the Agreement. The trial court granted attorney fees of $666,849.50 to Henderson/SPS and $275,916.75 for attorney fees plus $11,195.68 in costs to Granite. Orders were subsequently filed and Habitat/Sage filed its third notice of appeal.

## DISCUSSION

### A. Petition for Writ of Mandate

#### 1. Standard of Review

Habitat first argues that because the July 7, 2004, agreement between City and Henderson stated that necessary consent or approvals would not be unreasonably withheld by either party, the standard of review that should be applied to its writ petition is a reasonableness standard. It then argues that because City denied Habitat QCE status for the Henderson project knowing both that a contract existed transferring the mitigation land to Habitat and that Habitat had already been deeded mitigation land from City projects, because the denial creates a "stigma" against it, and because City's resolution was an adjudicatory action, a fundamental right is implicated, which requires an independent review standard.

Generally, the inquiry for the issuance of a writ of administrative mandamus is whether the entity whose decision is challenged committed a prejudicial abuse of discretion by failing to proceed in the manner required by law,

by making a decision that is not supported by the findings it made, or by making findings that are not supported by the evidence. (§ 1094.5, subd. (b).) In cases in which the court is authorized by law to exercise independent judgment, an abuse of discretion occurs if the reviewing court determines that the findings are not supported by the weight of the evidence. In all other cases abuse of discretion may only be established if the findings are not supported by any substantial evidence, in light of the whole record. (§ 1094.5, subd. (c).)

 While not terming it precisely as such, Habitat essentially argues that the clause in City's agreement with Henderson requiring that City not unreasonably withhold approvals should be viewed as a waiver of the general standard of review. "All case law on the subject of waiver is unequivocal: ' "Waiver always rests upon intent. Waiver is the intentional relinquishment of a known right after knowledge of the facts.["] [Citations.] The burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver." ' [Citations.]" (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60 [35 Cal.Rptr.2d 515].) Further, "[t]he pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right." (*Ibid.*) In reality, what Habitat seeks to do is to enforce a term in an agreement to which it was not a party, based upon an intent that it ascribes to the parties. However, Habitat has not presented any evidence that by agreeing not to unreasonably withhold approvals, that City was knowingly and intentionally waiving its right to the legal standard of review in any future litigation concerning the agreement, whether brought by a party to the agreement or otherwise. There is simply no evidence that the parties intended anything by the clause other than that they exercise mutual good faith in the future execution of the agreement. Indeed, were we to interpret this general and common contractual clause as reflecting the intent ascribed to the parties by Habitat, we can conceive of few instances involving litigation over a contract that would not include such a waiver of the typical burden of proof/standard of review. (See *Benavides v. State Farm General Ins. Co.* (2006) 136 Cal.App.4th 1241, 1249 [39 Cal.Rptr.3d 650] [all contracts contain an implied covenant of good faith and fair dealing requiring the parties to act reasonably].) Habitat failed to meet its burden on appeal.

In addition, Habitat has failed to address the clause in the agreement that states that consent will not be unreasonably withheld, "unless the context otherwise indicates . . . ." Although we do not conclude that this clause applies here, Habitat has not attempted to show that it does not. Therefore, on this independent ground we must again conclude it has not met its burden. Consequently the trial court did not err in refusing to apply a reasonableness standard in determining whether the writ should be granted.

Habitat next claims that it had a fundamental vested right to obtain the mitigation property because it had a contract with Henderson/SPS and Granite. When a trial court reviews an administrative decision that substantially affects a fundamental vested right, it must exercise its independent judgment on the evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816–817, fns. 8, 9 [85 Cal.Rptr.2d 696, 977 P.2d 693] (*Fukuda*).) In the context of judicial review of administrative decisions, a fundamental right is one that is of such importance to the individual in the life situation that its vital nature demands a full and independent judicial review when abridged. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242].)

Habitat's argument misperceives the nature of the decision rendered by City. The question under City's consideration was whether the applicant had sufficiently demonstrated that Habitat met its criteria to be a QCE for mitigation measure BIO-1 for the Henderson project. Simply because Habitat may have had a contract with Henderson/Granite to obtain a specified parcel of land, it does not follow that it had a fundamental, vested right to be found to be a QCE by City. Indeed, Habitat strongly urges in these consolidated appeals that the two questions are completely unrelated.

In addition, even if City's resolution had directly involved whether Habitat would receive land that it had contracted to obtain, there is no evidence in the record that the contract had been completed at the time of City's decision. In fact, at the time of City's decision, there existed a lawsuit wherein Habitat claimed that the contract had been breached because the land had not been transferred as promised. A vested right is one that is either already possessed or legitimately acquired. (*Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392, 396 [188 Cal.Rptr. 891, 657 P.2d 383].) It is not one that is merely sought. (*Bixby v. Pierno, supra*, 4 Cal.3d at p. 144.) Habitat did not own the land and, given the then existing dispute, it can hardly be said that Habitat had any right certain to the BIO-1 mitigation property at the time City rendered its decision. Habitat does assert that it was the "equitable owner" of the mitigation land because all of the conditions had been met for the close of escrow under its Agreement with Henderson/Granite, but while it concludes that its right to the property became vested once it became the equitable owner, it cites no authority for that proposition. The argument is therefore waived. (*Roden v. AmerisourceBergen Corp.* (2007) 155 Cal.App.4th 1548, 1575–1576 [67 Cal.Rptr.3d 26] (*Roden*).)

Habitat next claims that it had a fundamental vested right to be a QCE because it had already received mitigation lands from prior City development projects. In this regard it attempts to analogize its right to that of licensees. Such cases have distinguished between the denial of the application for a license, which does not contemplate a vested right, and the suspension or

revocation of an existing license, which does. (*Berlinghieri v. Department of Motor Vehicles, supra*, 33 Cal.3d at p. 396.) City's resolution does not affect any right that Habitat had to own or manage the property that it already had. Nor does it affect any right that Habitat might have to own or manage property related to any future project should it manage to demonstrate compliance with City's criteria. The resolution is specific to determining whether Habitat is a QCE for mitigation measure BIO-1 for the Henderson project and is therefore most analogous to the denial of an application for a license, which involves no fundamental vested rights. (*Ibid.*)

Next, Habitat claims that City's denial of QCE status stigmatizes it and it is therefore entitled to independent review. The case that it cites, *Lubey v. City and County of San Francisco* (1979) 98 Cal.App.3d 340 [159 Cal.Rptr. 440], held that where a probationary public employee is terminated based upon charges of misconduct that stigmatize his or her reputation, seriously impairs his or her ability to earn a living or might seriously damage his or her standing in the community, due process requires notice and an opportunity to be heard prior to the termination. (*Id.* at pp. 345–346.) The *Lubey* court did not speak to the proper standard of review and thus the case does not stand for the proposition for which Habitat cites it. In addition, unlike the *Lubey* case where evidence supported the finding that the employees suffered stigma, Habitat merely concludes that City's resolution "makes it impossible for Habitat Trust to continue to function as a viable land trust" and "makes it impossible for Habitat Trust to obtain further lands in the County." It does not cite to any evidence that demonstrates that to be the case. To further distinguish *Lubey*, in light of our discussion of the nature of City's resolution, we find such stigma as severe as would be suffered by a termination for misconduct unlikely in this case. City's resolution does not conclude that Habitat had engaged or might engage in any wrongdoing. Rather, it merely stated that in relation to the Henderson project, insufficient information was provided for City to conclude that Habitat met *City's* criteria to allow it to have the mitigation lands transferred to it. The trial court did not err in determining that Habitat failed to demonstrate an independent review standard should apply in this case, and properly engaged in a substantial evidence review.

None of this discussion affects the standard of review on appeal since, even when the trial court is required to apply the independent judgment standard of review, the standard of review on appeal of the trial court's determination remains the substantial evidence test. (*Fukuda, supra*, 20 Cal.4th at p. 824.)

### 2. *Due Process*

Habitat next asserts that City engaged in backroom dealing in order to establish criteria that would exclude Habitat as a QCE and then adopted those

criteria and found it did not meet them without providing meaningful notice and an opportunity to be heard.

The evidence in the record does not support any finding that improper ex parte communications occurred with a view to denying Habitat QCE status with respect to the Henderson project. County Supervisor Paul Biane contacted City in June 2004, requesting that it change its development agreements to indicate a preference for County special districts to receive CEQA mitigation lands because it was accountable to and available to the public, had an approved management plan and had adequate resources. In response, City did not change its development agreement, but adopted a procedure by which the approval of any other QCE would be done by the City Council instead of by Planner. While Habitat ascribes nefarious purposes to this by labeling it a "backroom deal" effected through "ex parte communications" that constituted "foul play," and decries City's failure to disclose Supervisor Biane's letter to it and to the public, it fails to cite any authority that might indicate any wrongful action by City in this situation. There is no evidence that City attempted to keep Supervisor Biane's correspondence, or its response thereto, a secret. Further, there is no evidence that this change from approval by Planner to approval by the City Council resulted in any material change to Habitat's rights. In fact, the record suggests that it was Planner, not the City Council, who suggested criteria for the approval of QCE's. This, and the fact that Planner recommended that the City Council find that insufficient evidence had been presented to conclude Habitat was qualified strongly suggest that the change in procedure reflected by the memo in response to Supervisor Biane's letter had no effect whatsoever on Habitat's rights.

Of course, this discussion assumes that Habitat had any "rights" with respect to the procedure City used to determine that it was a QCE for the Henderson project. The only right that Habitat claims City abridged was its due process right to meaningful notice and an opportunity to be heard prior to City's resolution. However, Habitat does not explain why it was entitled to due process in the first instance. Article I, section 7, of the California Constitution provides that "[a] person may not be deprived of life, liberty, or property without due process of law . . . ." The Fourteenth Amendment to the United States Constitution provides the same protection. Habitat makes no argument that shows how City's action deprives it of a liberty or property interest for which due process attaches. Rather, its assertions merely assume that it has a due process right. By failing to demonstrate that it is entitled to the right that it claims, Habitat has not carried its burden on appeal to prove that it is entitled to the relief it seeks. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 [109 Cal.Rptr.2d 256] (*State Farm*) [appellant's burden to show prejudicial error].)

Even were we to assume that Habitat had demonstrated its right to due process, the record demonstrates that it was aware of the conditions under consideration by City and was in fact heard prior to the vote on the resolution. Many of Habitat's complaints center upon City's failure to communicate directly with it concerning the information that City desired in order to reach a decision. This stems from the fact that Henderson/Granite was the project applicant and had the contractual relationship with City regarding the transfer of mitigation land. The record establishes Habitat's knowledge of the information requested by City in order to establish its qualifications no later than November 3, 2004. In addition, when Granite offered to allow Habitat to communicate directly with City, Habitat strongly refused, indicating that it was "not the obligation of [Habitat]."

Despite that refusal, Habitat began corresponding directly with City on January 31, 2005, demanding notice of City's proposed findings and an opportunity to be heard. The record demonstrates that City complied with Habitat's request by sending it a copy of the staff report and continuing its deliberation of the matter so that the materials submitted by Habitat could be considered. City accepted and reviewed documents submitted by Habitat in response to Planner's staff reports, and counsel for Habitat spoke at the City Council meeting prior to the adoption of the resolution. Thus, Habitat had notice of the specific deficiencies noted by Planner in support of his recommendation not to approve Habitat and had an opportunity to address those issues prior to any action by City. Assuming that Habitat was entitled to due process, a fact that it has not demonstrated, the trial court did not err in concluding that due process had been afforded.

### 3. Adequacy of City's Criteria

Habitat argues that the criteria that City established for determining whether an entity is a QCE were improperly adopted, not in a manner required by law, and should be nullified or voided because they are vague and uncertain, and because they conflict with state and federal laws.

Habitat first claims that City's adoption of criteria to assess whether an entity would be a QCE for the purpose of obtaining CEQA mitigation lands for which City bore responsibility was improper because the action was akin to legislation. Habitat argues that the item was not on the agenda for the February 16, 2005, meeting, nor was it discussed prior to its adoption by City. Although it does not so state, we presume Habitat's purpose in citing *Central Manufacturing District, Inc. v. Board of Supervisors* (1960) 176 Cal.App.2d 850, 860 [1 Cal.Rptr. 733], is to claim that City's adoption of these criteria was in the nature of an ordinance rather than a resolution. Habitat then claims that City's action did not follow its own ordinance

adoption procedures (but provides no legal authority), or state laws (citing Gov. Code, § 36931 et seq., without any further specificity). We decline to consider this assertion, which is raised for the first time on appeal. " 'A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant. [Citation.]' [Citations.] . . . Whether the rule is to be applied is largely a question of an appellate court's discretion. [Citation.]" (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].)

■ Habitat next argues that City's criteria are unconstitutionally vague and uncertain because it cannot be determined what is necessary in order to comply with them. "It is well settled that 'a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' [Citations.] This principle applies not only to statutes of a penal nature but also to those prescribing a standard of conduct which is the subject of administrative regulation. [Citations.] The language used in such legislation 'must be definite enough to provide a standard of conduct' for those whose activities are prescribed as well as a standard by which the agencies called upon to apply it can ascertain compliance therewith. [Citation.]" (*McMurtry v. State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 766 [4 Cal.Rptr. 910] (*McMurtry*).)

Specifically, Habitat claims that it does not understand what is meant by the requirement that an entity seeking to hold mitigation land must "demonstrate *sufficient capability* in terms of *resources*, available staff, and offices to provide *sufficient management* of the land and to respond in a *timely manner* to issues that arise thereupon" or by the requirement that it "must be *accountable* to the members of the *immediate community* for the entity's management of the land" with respect to the italicized terms. (Italics added.) Once again, the problem with this assertion is that it assumes that the analysis of unconstitutional vagueness should apply in the context of City's resolution without citation to any authority that it should be so. Counsel did not attempt to remedy this problem in his oral argument on this point. The issue is consequently waived. (*Roden, supra,* 155 Cal.App.4th at pp. 1575–1576.) In addition, this court has been unable, through its independent research, to find any case wherein a City resolution, as opposed to an ordinance or code section, was analyzed for constitutionality under the standard suggested here by Habitat. Once again we must conclude that Habitat has not carried its burden on appeal to prove that it is entitled to the relief it seeks. (*State Farm, supra,* 90 Cal.App.4th at p. 610.)

■ Even were we to assume that City's resolution should be analyzed for constitutional vagueness, we would not conclude that the terms about which Habitat complains are impermissible. "Approved rules by which to judge the sufficiency of a statute in the premises have been applied in numerous decisions, i.e., the words used in the statute should be 'well enough known to enable those persons within its purview to understand and correctly apply them.' [Citation]; words of long usage, or which have an established or ascertainable meaning in the profession or industry involved, or those which have been given a definite and restrictive interpretation by the courts, or the meaning of which may be determined from a fund of human knowledge and experience, will meet the test of certainty. [Citations]; if the words used may be made reasonably certain by reference to the common law, to the legislative history of the statute involved, or to the purpose of that statute, the legislation will be sustained [citations]; and a standard fixed by language which is reasonably certain, judged by the foregoing rules, meets the test of due process 'notwithstanding an element of degree in the definition as to which estimates might differ.['] [Citations.]" (*McMurtry, supra,* 180 Cal.App.2d at pp. 766–767.) Further, " '. . . enactments should be interpreted when possible to uphold their validity [citation], and . . . courts should construe enactments to give specific content to terms that might otherwise be unconstitutionally vague. [Citations.]' [Citation.]" (*L & M Professional Consultants, Inc. v. Ferreira* (1983) 146 Cal.App.3d 1038, 1050 [194 Cal.Rptr. 695].)

Given these standards by which we are constrained to test the language chosen by City for its criteria, and given City's clearly stated purpose to enable it to implement and enforce CEQA mitigation measures by ensuring any QCE would be able to manage the land in conformance with the required mitigation measures, we do not find the italicized terms to be so vague that men of common intelligence would guess at their meanings. All of the complained of terms are sufficiently clear when viewed in terms of City's stated purpose. (See *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 368–369 [185 Cal.Rptr. 453, 650 P.2d 328] [use of generic terms like "sufficient" and "timely" do not render a statute unconstitutionally vague].) The fact that Habitat may not have agreed with City's perceived need for the criteria that were established does not mean that it could not, using a commonsense, practical construction, figure out what they meant.

Finally, Habitat claims that City's requirements for determining what is a QCE impermissibly conflict with federal and state laws, citing 26 United States Code sections 170, subdivision (h)(1)(B) and 509, subdivision (a)(2), and Civil Code section 815.3, and thereby run afoul of the preemption doctrine. Once again, Habitat assumes that the preemption analysis applies to criteria set out by a local agency in order to adopt a resolution. It has failed to cite any authority for this proposition and has therefore waived the issue.

(*Roden, supra*, 155 Cal.App.4th at pp. 1575–1576.) However, even if the preemption analysis applies under circumstances such as those involved here, we find no violation.

The United States Constitution allows Congress to preempt state law such that if one conflicts with a federal statute it is " ' " ' "without effect." ' " ' " (*County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 818–819 [81 Cal.Rptr.3d 461].) The intent of Congress is paramount in determining whether preemption applies. (*Id.* at p. 819.) There are four types of federal preemption: when Congress expressly states that it is doing so, when the federal and local laws cannot both be followed, when the local rule impedes Congress's objective in enacting the federal law, and when federal legislation so fully occupies the field that no room remains for additional local regulation. (*Ibid.*)

█ Title 26 of the United States Code, cited by appellants, is the Internal Revenue Code. Section 170, subdivision (h)(1)(B), of that title states that for purposes of qualifying for a tax deduction for a qualified conservation contribution, such a contribution is one that is given to a "qualified organization." Title 26 United States Code section 509 defines a private foundation and subdivision (a)(2) provides an exception to that definition. The purpose of these statutes is to provide federal tax deductions for contributions of land to, and federal tax-exempt status to, certain organizations such as Habitat. Under none of the four standards enumerated above can it be said that by enacting legislation designed to obtain revenue for the federal government Congress intended to completely and exclusively define what entities a local agency should be required to approve as owners and/or managers of mitigation land under a California statute, CEQA. There is simply no basis for applying federal preemption rules here.

█ Similarly, any local regulation or ordinance that conflicts with the state's general laws is preempted and is thus void. (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1067 [63 Cal.Rptr.3d 67, 162 P.3d 583].) Such a conflict will be found when the local rule duplicates, contradicts or enters into an area fully occupied by state legislation. (*Ibid.*) A duplicative rule is one that mimics a state law and a contradictory rule is one that cannot be reconciled with a state law, while a rule enters a fully occupied field when the Legislature expressly states an intent to occupy the legal area or impliedly does so. (*Id.* at pp. 1067–1068.)

Civil Code section 815.3 defines who may acquire and hold conservation easements. With respect to entities such as Habitat it states, "A tax-exempt nonprofit organization qualified under Section 501(c)(3) of the Internal Revenue Code and qualified to do business in this state which has as its

primary purpose the preservation, protection, or enhancement of land in its natural, scenic, historical, agricultural, forested, or open-space condition or use" may do so. (Civ. Code, § 815.3, subd. (a).) City's criteria for approving an entity to hold mitigation land for condition BIO-1 do not duplicate this section, nor do they conflict with it. There is no express indication that the state Legislature intended to preempt this area of the law. Further, the implication, through the use of the permissive term "may" as opposed to words such as "shall be entitled to" is that the description provided by Civil Code section 815.3 is a minimum requirement. In that context City's criteria are more akin to supplemental regulations than conflicting rules. This is especially true under the instant circumstances where City is required by other state law to ensure implementation and enforcement of the mitigation measures imposed by CEQA. (Pub. Resources Code, § 21081.6, subd. (b); Cal. Code Regs., tit. 14, §§ 15097, subd. (a), 15126.4, subd. (a)(2).) City's criteria do not impermissibly conflict with state law.

Habitat specifically complains that contrary to City's assertion, state law does not require a charitable trust with gross annual revenue of less than $2 million to provide an annual audit. (Gov. Code, § 12586, subd. (e).) That code section is part of the Supervision of Trustees and Fundraisers for Charitable Purposes Act, which provides for oversight of fiduciaries of charitable trusts by the Attorney General and requires that such entities file certain reports to be maintained by the Attorney General. (Gov. Code, §§ 12580, 12584.) While Planner asked Henderson/Granite for Habitat's "most recent auditor's report" City's criteria do not require the filing of an audit with the Attorney General. Thus, City's criteria do not conflict with this law. Further, the purpose of requesting an audit report was to enable City to determine whether Habitat was fiscally responsible and reliable. Independent of the Attorney General's reporting requirement, it was entirely reasonable for City to require some evidence of Habitat's financial resources and accountability in determining whether mitigation land should be turned over to its care.

### 4. *City's Findings Are Supported by Substantial Evidence*

Finally, Habitat contends that certain of City's findings, specifically the second through fourth findings, are not supported by the evidence. As indicated above, the standard of review on appeal of the trial court's determination is the substantial evidence test. (*Fukuda, supra,* 20 Cal.4th at p. 824.) We must review the administrative findings and determine if there is substantial evidence to support them, in light of the whole record. (*Auerbach v. Los Angeles County Assessment Appeals Bd. No. 2* (2008) 167 Cal.App.4th 1428, 1438 [85 Cal.Rptr.3d 105] (*Auerbach*); § 1094.5, subd. (c).) "Under the substantial evidence test, courts do not reweigh the evidence. They determine

whether there is any evidence (or any reasonable inferences which can be deduced from the evidence), whether contradicted or uncontradicted, which, when viewed in the light most favorable to an administrative order or decision[,] will support the administrative . . . findings of fact. Administrative . . . findings are presumed to be supported by the record; and orders [and] decisions . . . are presumed to be correct. Persons challenging them have the burden of showing that they are not supported or correct. [Citations.]" (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 849, fn. 11 [75 Cal.Rptr.3d 887].)

City's second finding stated that Habitat "has not demonstrated capability to provide sufficient management of the land described in Mitigation Measure BIO-1, or to respond in a timely manner to issues that arise regarding the land." More specifically, City was concerned that the audit report Habitat provided with respect to its financial condition was a 2002 report from an umbrella organization and was therefore not specific to Habitat. This finding is supported by the record. While Habitat also provided City with a 2003 statement of profit and loss that document does not demonstrate that Habitat is "conducting its financial affairs in compliance with applicable procedures, accounting standards and laws." City was also concerned that Habitat did not have local staffing adequate to ensure management of the land on an ongoing basis. The record also supports this finding. The information provided by Habitat demonstrated that Habitat's closest office is located in Pasadena, approximately 40 miles distant. Habitat admitted that it does not have employees but hires consultants as needed and that board members and volunteers are the ones who monitor Habitat's sanctuary land. Only two board members live in California and neither of those lives in Rancho Cucamonga. When considered with all of the other information in the record it was reasonable for City to reach the conclusion that it did.

City's third finding stated that Habitat "has not provided the City with a site-specific Habitat Resource Management Plan [or] any Operations Plan, including a maintenance schedule for the land." City found that the documents provided by Habitat were a generic and incomplete document, adapted from one produced by San Bernardino County OS-1, and an assessment of needs with no indication that the assessment had been or would be adopted by Habitat. The record supports this finding. The management plan does contain blanks, is not site specific, but rather covers the entire area containing presumably similar habitat, and does not attach referred-to maps. The assessment also does not refer to the site in question, but to other parcels already owned by Habitat. And, rather than challenging the findings as unsupported, Habitat tries to explain why City should have found those documents adequate to its purposes. Based upon the evidence before it, City could reasonably have made the finding that it did.

City's fourth finding stated that Habitat "has not demonstrated that its operations are conducted in a manner sufficient to provide adequate accountability to members of the immediate community." More specifically City was concerned that Habitat did not make itself available to members of the community to make reports or complaints or to provide input and did not demonstrate financial accountability to the public. These findings are supported by the record. Habitat's nearest office is in Pasadena, a considerable distance for a concerned local citizen to travel. Habitat's bylaws indicate that regular meetings of its board of directors are not necessary, may be conducted by teleconference, and may be held without notice. The only evidence of any meeting ever being held by Habitat shows that it occurred in Providence, Rhode Island, and that the directors in attendance did not constitute a quorum. There is no evidence that any meetings were ever open to the public or that public comment was in any way solicited. We have already discussed the financial documents provided to City. Based upon the evidence before it, City could reasonably have made the finding that it did.

While it is true, as Habitat points out, that certain of City's specific findings, for example that Habitat failed to provide a list of its offices and that it only had three board members, were incorrect[4] based upon evidence in the record, that does not change the outcome of this appeal. Nor do Habitat's complaints that City's findings seemed to ignore evidence in the record that might have supported a contrary conclusion. While City could have reached a different conclusion than it did based upon the evidence, that is not our concern. (*Antelope Valley Press v. Poizner, supra*, 162 Cal.App.4th at p. 849, fn. 11 [in substantial evidence review it does not matter whether evidence is contradicted or other reasonable inferences could be drawn].) Our standard of review requires that we determine whether there exists substantial evidence, in light of the entire record, to support City's conclusion that Habitat had not demonstrated that it was an appropriate entity to own the BIO-1 mitigation land. (*Auerbach, supra*, 167 Cal.App.4th at p. 1438; § 1094.5, subd. (c).) The record does contain such evidence, as demonstrated above. Consequently, we have no grounds to grant the relief requested.

In addition, ultimately, what Habitat seeks is to force City to recognize it as a QCE. However, mandamus will not lie to compel a public official to exercise his or her discretion in a particular manner. (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 221 [118 Cal.Rptr.2d 187].) Habitat has failed to demonstrate that City had no discretion in this matter or that City exercised

---

[4] In its brief Habitat repeatedly cites to a letter, dated January 13, 2005, and its attachment, in support of its claim that the City was aware of certain facts. This letter is addressed to a law firm representing Granite and there is no evidence in the record that it or its attachments was ever received by the City.

its discretion in a fashion not permitted by law. Consequently, we must conclude that the trial court did not err in refusing to grant Habitat's writ petition.

### B. *Motion for Summary Judgment*

#### 1. *Standard of Review*

The purpose of summary judgment is "to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citations.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 844 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) Our de novo review is governed by section 437c, which provides in subdivision (c) that a motion for summary judgment may only be granted when, considering all of the evidence set forth in the papers and all inferences reasonably deducible therefrom, it has been demonstrated that there is no triable issue as to any material fact and the cause of action has no merit. The pleadings govern the issues to be addressed. (*City of Morgan Hill v. Brown* (1999) 71 Cal.App.4th 1114, 1121 [84 Cal.Rptr.2d 361].) A defendant or a cross-complainant moving for summary judgment bears the burden of persuasion that there is no triable issue. For a defendant, this burden is met by producing evidence that demonstrates that a cause of action has no merit because one or more of its elements cannot be established to the degree of proof that would be required at trial, or that there is a complete defense to it. Once that has been accomplished, the burden shifts to the plaintiff to show, by producing evidence of specific facts, that a triable issue of material fact exists as to the cause of action or the defense. (*Aguilar,* at pp. 849–851, 854–855.) For a cross-complainant this burden is met by producing evidence that demonstrates that a cause of action is meritorious because each of its elements can be established to the degree of proof that would be required at trial, or that there is no defense to it. Once that has been accomplished, the burden shifts to the cross-defendant to show, by producing evidence of specific facts, that a triable issue of material fact exists as to the cause of action or defense. (*Id.* at pp. 849–855.)

#### 2. *The Allegations of the Pleadings*

The operative second amended complaint alleges causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing against Henderson/SPS and Granite. The sole cause of action alleged against County is for imposition of a constructive trust. Henderson's cross-complaint alleges three causes of action for rescission based upon failure of consideration, mutual mistake and duress. However, its motion for summary judgment addressed only failure of consideration and mistake.

⬛ In order to establish a breach of contract Habitat/Sage must demonstrate the existence of a contract that they performed or were excused from performing, that the contract was breached and that damages resulted from the breach. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1178 [80 Cal.Rptr.3d 6].) **(7)** The covenant of good faith and fair dealing is implied in every contract and requires that neither party do anything that will injure the right of the other to receive the benefits of the contract. (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43 [86 Cal.Rptr.2d 855, 980 P.2d 407].) **(8)** A constructive trust is an equitable remedy to compel the transfer of property by one who is not justly entitled to it to one who is. (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 457 [61 Cal.Rptr.2d 707].) A constructive trust may only be imposed when three conditions are met: the existence of a res, the plaintiff's right to the res, and the defendant's acquisition of the res by some wrongful act. (*Campbell v. Superior Court* (2005) 132 Cal.App.4th 904, 920 [34 Cal.Rptr.3d 68].)

Habitat/Sage alleged that Henderson/SPS and Granite breached the Agreement by failing to transfer title to the 86 acres of land, by failing to pay for the promised barriers and endowment, by failing to record the notice of agreement and by failing to allow Habitat/Sage to harvest plantlife from the development site prior to grading. They alleged that Henderson/SPS and Granite breached the covenant of good faith and fair dealing because they knew of and attended a meeting between County Supervisor Biane and County and/or City staff wherein Supervisor Biane raised objections to Habitat's receipt of mitigation lands and/or wherein opposition to Habitat's receipt of mitigation land was discussed. They further alleged that Henderson/SPS and Granite influenced City's decision to change its procedures and its determination that Habitat was not qualified to manage the BIO-1 mitigation land. Finally, Habitat/Sage alleged that a constructive trust should be imposed upon County because it took possession of the land that was the subject of the Agreement knowing that Habitat/Sage had a superior right to it and that the grant deed was invalid because the grantor was mentally incompetent at the time it was executed.

⬛ With respect to Henderson's cross-complaint, "[i]f the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause" a party may rescind a contract. (Civ. Code, § 1689, subd. (b)(4).) A contract may also be rescinded if the consent of the rescinding party was given by mistake. (Civ. Code, § 1689, subd. (b)(1).) The party attempting to void the contract as a result of mistake must also show that it would suffer material harm if the agreement were enforced, though that

need not be a pecuniary loss. (*Guthrie v. Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 886 [124 Cal.Rptr. 577].) Henderson alleged that it sought to develop unimproved real property that it owned, and a condition for approval of that development was the mitigation of the loss of habitat incident to the development through the conveyance of land to be set aside as open space in perpetuity. Habitat/Sage represented that they were appropriate organizations to receive and manage mitigation land to satisfy the mitigation condition so Henderson entered into the Agreement with them. However, Habitat/Sage were determined not to be acceptable owners/managers of the mitigation land so that consideration to Henderson in entering the Agreement failed in a material respect. Henderson also alleged that at the time the Agreement was entered, both it and Habitat/Sage mistakenly believed and expected that Habitat would be found to be an acceptable owner or manager of the mitigation land.

### 3. *Defendants' and Cross-complainant's Showing*

Henderson/SPS moved for summary judgment of the first cause of action of the second amended complaint on the grounds that Habitat/Sage could not establish that the Agreement was breached because there was an implied condition that was not fulfilled, and based upon the affirmative defenses of commercial frustration and impossibility, failure of consideration and mistake. They moved for summary judgment of the second cause of action on the ground that there was no evidence that they influenced City to find that Habitat/Sage was not qualified to obtain the BIO-1 mitigation land. Henderson also moved for summary judgment on its cross-complaint for rescission on the grounds of failure of consideration and mistake.

Granite's motion for summary judgment was based on the same grounds as Henderson/SPS's. However, Granite Homes of California, Inc., Granite Homes, Inc., and Granite Construction Services, LP, also moved for summary judgment on the ground that they were never parties to the Agreement and therefore could not be liable for breach of contract or breach of the covenant of good faith and fair dealing. The trial court granted summary judgment to those entities on that basis. On appeal, Habitat/Sage do not challenge the trial court's determination that these entities were not parties to the Agreement. Consequently any contention that the trial court erred in making that determination is abandoned and judgment is affirmed in favor of Granite Homes of California, Inc., Granite Homes, Inc., and Granite Construction Services, LP, on this separate and independent basis. (*Bossert v. Stokes* (1960) 179 Cal.App.2d 457, 462 [3 Cal.Rptr. 884].) The only Granite entity with which this appeal is concerned is Rancho 2004, LLC (Rancho).

County moved for summary judgment on the grounds that Habitat/Sage could not establish their right to the land in question for the same reasons argued by Henderson/SPS and Rancho in their motions, that section 405.61 gave County a superior right to the land, and that there was no evidence that the grantor was mentally incompetent at the time the deed was executed. The trial court granted summary judgment on each of these grounds.

The land was to be conveyed to Habitat for "habitat conservation purposes." Mitigation condition BIO-1 originally required transfer of mitigation property to County. Habitat/Sage objected to the amount of land to be set aside and to it being transferred to County. They threatened to sue Henderson unless it agreed to transfer a larger parcel of mitigation land to Habitat and to pay it in excess of $570,000. In response, and prior to execution of the Agreement, Henderson representatives met with Planner and asked to have mitigation condition BIO-1 altered to allow transfer of the mitigation land to Habitat. At that time Planner indicated that "approval of the conservation entity was within his discretion and that he perceived no problem with designating Habitat . . . as a recipient of the mitigation property in satisfaction of Condition BIO-1." Planner voiced no objection to Henderson's plan to transfer the BIO-1 mitigation land to Habitat.

The final EIR, issued on April 30, 2004, prior to the execution of the Agreement, allowed the transfer of the mitigation land under mitigation measure BIO-1 to County "or other qualified conservation entity approved by the City." In response to the final EIR, and prior to executing the Agreement, Sage's executive director, Leona Klippstein (Klippstein) wrote to City indicating that Sage and Henderson had agreed that the mitigation land would be transferred to Habitat "rather than the County." She also stated that while the final EIR changed the language regarding the entity that would receive the mitigation land, Sage was "concerned that it is not specific enough" and requested that it be more specific as to which conservation entity would receive the lands prior to the vote of the planning commission to approve the final EIR. Habitat/Sage urged at oral argument that their objection to the terminology proposed for BIO-1 proves that it did not believe satisfaction of BIO-1 was the essential purpose of the Agreement. On the contrary, if it did not matter to Habitat/Sage whether or not BIO-1 was satisfied, they would never have needed to be involved in City's approval process at all and Klippstein's comments would have been unnecessary. Klippstein was aware of the BIO-1 mitigation condition prior to signing the Agreement.

The purchase agreement between Johnson and Henderson, entered into prior to the Agreement, and by which Henderson obtained the right to purchase the mitigation property, stated in its recitals that the purpose of that contract was to convey the property to Sage to fulfill the mitigation requirement imposed

as a condition of approval of the tentative tract map for the development. The Johnson and Henderson agreement was attached as an exhibit to Habitat/Sage's second amended complaint.

After the Agreement was entered into, counsel for Habitat/Sage confirmed that the purpose of the Agreement was to satisfy mitigation condition BIO-1 when he wrote that certain specific language for conservation and open space deed restrictions should be attached to the grant deed(s) and if Henderson or City required different language, Habitat/Sage would have to approve it. Once again, if compliance with City's BIO-1 mitigation condition was not contemplated, there would be no reason for Habitat/Sage to be concerned with City's requesting different language in the deed. Counsel for Habitat/Sage also sent a letter dated January 31, 2005, to City complaining that City's decision that Habitat was not qualified to hold mitigation land was made with the knowledge that Habitat/Sage had a contract to hold that land in connection with the Henderson development. The letter continued stating that City knew that Habitat and Henderson had entered an agreement to transfer "the subject mitigation land" to Habitat and that City had amended the development agreement with Henderson for that purpose. Finally, the letter accused City of taking intentional action to impair the contract between Habitat/Sage and Henderson. Again, if compliance with City's BIO-1 mitigation condition was not contemplated then Habitat/Sage would not have cared what action City took.

■ Since approval of Habitat as an entity qualified to receive the transfer was necessary to fulfill the purpose of the Agreement to satisfy mitigation condition BIO-1 through the transfer of mitigation land to Habitat, approval of Habitat was an implied condition of the contract. Because the implied condition did not come to pass when City determined that Habitat was not a proper entity to receive the mitigation land, Henderson/SPS and Rancho had no duty to perform under the Agreement. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313 [24 Cal.Rptr.2d 597, 862 P.2d 158]; Civ. Code, § 1436.) Based upon this showing we must conclude that Henderson/SPS and Rancho met their burden of demonstrating that the first cause of action had no merit because one or more of its elements could not be established to the degree of proof that would be required at trial.

As to the second cause of action for breach of the implied covenant of good faith and fair dealing, Henderson/SPS and Rancho demonstrated that Habitat/Sage had not produced any evidence to support their theory that Henderson/SPS or Rancho had any influence in City's decision that Habitat had failed to demonstrate its qualification to hold the mitigation land. Henderson/SPS's attorney averred that they learned of City's change in procedure to approve Habitat long after the Agreement was entered and were

otherwise unaware of and had no part in City's change of procedure. Planner testified that he made the decision regarding the change in procedure at a meeting on June 29, 2004. Henderson/SPS's representatives were unaware of anyone associated with those entities attending any meeting with Supervisor Biane on June 29, 2004, or any date other than June 14, 2004. Supervisor Biane's representative who attended the June 29, 2004, meeting did not identify Henderson/SPS or Rancho as having anyone present at the meeting. Henderson/SPS and Rancho argued that Habitat's response to discovery requesting all facts upon which it based its contention that they attempted to influence City's decision had yet to produce any evidence, but merely counsel's argument, assumptions and speculation. Based upon this showing we again conclude that Henderson/SPS and Rancho met their burden of demonstrating that the second cause of action has no merit because one or more of its elements could not be established to the degree of proof that would be required at trial.

 Henderson/SPS and Rancho also argued that there were no triable issues of material fact as to their affirmative defenses of impossibility and frustration of purpose. " 'A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.' [Citation.]" (*Mineral Park Land Co. v. Howard* (1916) 172 Cal. 289, 293 [156 P. 458].) This does not mean that a party can avoid performance simply because it is more costly than anticipated or results in a loss. (*Ibid.*) Impracticability does not require literal impossibility but applies when performance would require excessive and unreasonable expense. (*City of Vernon v. City of Los Angeles* (1955) 45 Cal.2d 710, 717 [290 P.2d 841].) Similarly, where performance remains possible, but the reason the parties entered the agreement has been frustrated by a supervening circumstance that was not anticipated, such that the value of performance by the party standing on the contract is substantially destroyed, the doctrine of commercial frustration applies to excuse performance. (*Lloyd v. Murphy* (1944) 25 Cal.2d 48, 53 [153 P.2d 47].) Henderson/SPS and Rancho argued that it was impracticable to require their performance because they would be required to convey 86 acres of land and over $570,000 to Habitat, without complying with City's conditions to build the development. They also argued that since the essential purpose of the Agreement was to satisfy mitigation condition BIO-1 by transferring mitigation land to Habitat, as demonstrated above, and that purpose could not be fulfilled as a result of the unanticipated circumstance that City determined Habitat did not qualify to hold the mitigation land, their performance was excused under the doctrine of commercial frustration. Henderson/SPS and Rancho's showing was sufficient to shift the burden to Habitat/Sage to show a triable issue of material fact on these defenses.

Next, Henderson/SPS and Rancho argued that there was a failure of consideration which is a sufficient ground to cancel a contract. (Civ. Code, § 1689, subd. (b)(4).) They urged, for the reasons stated above, that under the terms of the Agreement, Henderson's consideration was, in part, to satisfy mitigation condition BIO-1 though conveyance of the property to Habitat. Consequently, City's failure to approve Habitat as a QCE to receive that land resulted in the failure of material consideration to Henderson. Henderson also argued these facts as grounds for summary adjudication of the first cause of action on its complaint for rescission.

Finally, Henderson/SPS and Rancho also claimed that there was a mistake of fact in that both parties to the agreement believed at the time of contracting that Habitat was a QCE and would be approved by City. Further because performance would require Henderson/SPS and/or Rancho to convey 86 acres of land and over $570,000 to Habitat without complying with City's conditions to build the development, enforcement of the agreement would be materially harmful and more onerous than had the facts been as believed by the parties at the time of contracting. Again Henderson argued these facts as grounds for summary adjudication of the second cause of action on its complaint for rescission. In both instances defendants' and cross-complaint's showing was adequate to shift the burden to Habitat/Sage to demonstrate the existence of a triable issue of material fact.

### 4. *Habitat/Sage's Response*

Preliminarily we note that the apparent failure of appellants to recognize the function of the appellate court or the nature of our review of a judgment based upon a summary judgment order, and the reflection of that failure in the effectively disorganized briefing has made our job infinitely more diffi-cult. Nevertheless, we have done our very best to comprehend appellants' arguments and to apply them to the appropriate causes of action and/or affirmative defenses.

We will first address Habitat/Sage's assertion on appeal that the trial court wrongfully sustained objections to its evidence posed by Henderson/SPS and Rancho since those rulings bear on Habitat/Sage's ability to meet their burden. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139 [127 Cal.Rptr.2d 145] [review of summary judgment does not consider evidence to which objections have been sustained].) Specifically, Habitat/Sage argue that the trial court abused its discretion in sustaining objections to the declarations of Klippstein, Craig Sherman and David Gribin (Gribin). However, they elaborate on only three instances where the trial court's rulings were allegedly in error. The balance of the challenged rulings are merely cited without explanation, other than to state that they reflect the

trial court's pattern of arbitrary, capricious and one-sided rulings. Appellants bear the burden of establishing an abuse of discretion occurred such that had the evidence not been wrongfully disallowed a different result more favorable to them would have been reached. (*County of Los Angeles v. Nobel Ins. Co.* (2000) 84 Cal.App.4th 939, 944–945 [101 Cal.Rptr.2d 320] [appellant's burden to spell out exactly how error caused miscarriage of justice].) Because they have not even attempted to meet this burden as to the rulings other than those discussed below, we consider as waived any such arguments they may have had. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105–106 [87 Cal.Rptr.2d 754]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545–546 [35 Cal.Rptr.2d 574].)

Habitat/Sage claim that the trial court improperly sustained defendants' objections Nos. 36 and 41. The trial court does not state the grounds for sustaining the objections; therefore, as Habitat/Sage concede, it is presumed that they were sustained on the grounds stated. We arrive at this conclusion by analogy to the well-known rule that when a specific ruling is not requested from the trial court, a challenge to that ruling is waived. (See, e.g., *City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 783–784 [97 Cal.Rptr.2d 140].) Had Habitat/Sage wanted specific rulings as to each objection posed, they should have requested them.

 Henderson/SPS's objection No. 36 (Rancho joined in Henderson/SPS's objections) challenged paragraph 37, lines 17 through 25 of Klippstein's declaration on the grounds that (1) the statements lacked foundation, (2) the statements were mere legal conclusions or conclusions without factual support, (3) the statements were improper opinion, (4) the statements were nothing more than argument, (5) the declarant failed to establish personal knowledge of the matters stated, and (6) the statements were irrelevant given the essential purpose of the Agreement and the fact that Habitat/Sage's qualifications were not an issue in the case. On appeal Habitat/Sage fail to address the objections that the challenged statements were conclusions and simple argument. Because argument and conclusory statements are the proper subject of objections (*Winnaman v. Cambria Community Services Dist.* (1989) 208 Cal.App.3d 49, 54 [256 Cal.Rptr. 40] [argument is not evidence]; *Pacific Architects Collaborative v. State of California* (1979) 100 Cal.App.3d 110, 119–120 [166 Cal.Rptr. 184]; *Colby v. Schwartz* (1978) 78 Cal.App.3d 885, 889 [144 Cal.Rptr. 624]), and given that Habitat/Sage concede that the trial court sustained the objections on all grounds stated, in the absence of any specific challenge, we must conclude that the trial court properly sustained the objections on these grounds. Because there were independent, unchallenged grounds for the trial court's order, Habitat/Sage's argument with respect to this objection fails.

 Henderson/SPS's objection No. 41 challenged paragraph 43, lines 1 through 7 of Klippstein's declaration on the grounds that the statement was irrelevant given the essential purpose of the Agreement, and because it was contrary to admissions made during the course of discovery. The excluded statement is: "I on behalf of Sage Council and Habitat Trust contemplated that the contract purpose of the Settlement Release Agreement (Exhibit 41) was to increase the amount of mitigation lands being set aside from the Henderson Creek project for permanent habitat conservation above and beyond the 54-acres required by the terms of approval of the Henderson Creek Project EIR; and to have the increased mitigation lands transferred to Habitat Trust instead of the County of San Bernardino." Habitat/Sage argue that the evidence was relevant to the issue of the parties' intent at the time of contracting, a central issue in the summary judgment motion. However, evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3 [6 Cal.Rptr.2d 554].) The courts will not enforce a party's unexpressed intention. (*Id.* at p. 1166.) Rather, "[t]he law imputes to a person the intention corresponding to the reasonable meaning of his language, acts, and conduct. [Citation.]" (*H. S. Crocker Co. v. McFaddin* (1957) 148 Cal.App.2d 639, 643 [307 P.2d 429].) Klippstein does not indicate that she expressed her asserted intention to anyone before or at the time of contracting. In addition, her prior language, acts and conduct evidence a contrary intention. Therefore, the trial court properly sustained the objection on the grounds of relevance. Because Habitat/Sage have failed to demonstrate that the evidence was improperly excluded on the grounds of relevance, we need not discuss their remaining grounds for arguing error as to this bit of evidence.

Habitat/Sage also argue that the trial court wrongfully struck paragraph No. 6 of Gribin's declaration. The objections were based upon, and presumably sustained for, lack of foundation, speculation, improper conclusion without factual support and being argument rather than evidence. The only argument raised by appellants as to the trial court's alleged error in striking this testimony is that it was plausibly relevant to certain issues. The objection was not based upon the relevance of the testimony and appellants have failed to address the grounds upon which the objection was sustained. Therefore, their argument fails.

Having determined what evidence we are constrained to consider, we now turn to the balance of Habitat/Sage's contentions on appeal. They first assert that the trial court erred in determining that the contract was not an integrated agreement, but was instead ambiguous and subject to interpretation through parole evidence. They also argue that Henderson/SPS and Rancho cannot use parole evidence to interpret the Agreement in a manner inconsistent with its terms and that the trial court improperly inserted into the contract "a term that

had been omitted" that resulted in voiding the Agreement, contrary to rules of interpretation. (Code Civ. Proc., § 1858; Civ. Code, § 1643.)[5] However, these arguments are raised for the first time on appeal. As discussed above, we therefore decline to consider them. (*Richmond v. Dart Industries, Inc., supra*, 196 Cal.App.3d at p. 874.)

Habitat/Sage next assert that Henderson/SPS and Rancho cannot establish the existence of an enforceable implied condition. They argue that implied conditions are not favored and require the following elements: "(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract." (*Cousins Inv. Co. v. Hastings Clothing Co.* (1941) 45 Cal.App.2d 141, 149 [113 P.2d 878].)

Habitat/Sage argue defendants cannot establish that the parties would have agreed to the implied condition if attention had been called to it because Klippstein averred that she would have rejected any proposal that Henderson/SPS's or Rancho's obligation be based upon City's approval of Habitat as a QCE. Habitat/Sage cannot properly make this argument because the evidence to which it cites was excluded as incompetent.

They next argue that the subject of conditions to the transfer of land and payment to Habitat was completely covered by the contract and there can be no implied covenant purporting to state additional conditions. As Henderson/SPS point out, this argument misperceives the issue. Habitat/Sage are correct that the Agreement lists six items as "the only conditions to the [close of escrow]." The implied term required by the purpose of the Agreement as discussed above, to wit, that Habitat had to be approved to have the mitigation land transferred to it, is not a condition to the close of escrow, but a condition to the very existence of an enforceable contract. Unlike the facts in the cases cited by Habitat/Sage (*Agosta v. Astor* (2004) 120 Cal.App.4th 596, 604 [15 Cal.Rptr.3d 565]; *Tomlinson v. Qualcomm, Inc.* (2002) 97 Cal.App.4th 934, 945 [118 Cal.Rptr.2d 822]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 340, fn. 10 [100 Cal.Rptr.2d 352, 8 P.3d 1089];

---

[5] We note that there is no competent evidence in the record to suggest that the parties ever made an express decision to omit language regarding Habitat's qualification to hold the mitigation land from the Agreement and that Civil Code section 1643 contains an exception when interpreting a contract so as to avoid making it inoperative would violate the intention of the parties.

*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419 [49 Cal.Rptr.2d 191]; *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710]) the implied condition found by the trial court here does not contradict any of the conditions for the close of escrow. On the contrary, the Agreement is silent as to the parties' belief regarding Habitat's qualification to hold the mitigation land. Once the trial court determined that the evidence demonstrated the primary purpose of the Agreement was to satisfy mitigation condition BIO-1 by transferring conservation land to Habitat, it properly concluded that Habitat's qualification to receive and hold the mitigation land was an implied condition to the formation of the Agreement.

Habitat/Sage complain that in determining the parties' contractual intent, the trial court improperly gave deference to the evidence presented by Henderson/SPS and Rancho in violation of section 437c, which requires that affidavits in opposition to summary judgment be broadly construed while those in support of summary judgment should be narrowly construed. They complain that the trial court accepted Henderson/SPS's and Rancho's evidence regarding all parties' contractual intent and ignored the contrary evidence Habitat/Sage gave regarding their own intent. They cite *Hoover Community Hotel Development Corp. v. Thomson* (1985) 167 Cal.App.3d 1130, 1136 [213 Cal.Rptr. 750] (*Hoover*) for the proposition that a statement of someone else's intent is a mere conclusion of law and is not competent evidence. However, they do not cite to any evidence in the record that they contend reflects someone else stating what their intent was at the time of contracting. This failure is sufficient in itself to reject the argument. (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379 [122 Cal.Rptr.2d 204].) In addition, the evidence of Habitat/Sage's intent at the time of contracting does not consist solely of statements by others, but upon statements and actions taken by Habitat/Sage themselves. The trial court did not have to rely on evidence that was improper according to *Hoover*. Lastly, while the trial court is required to broadly construe evidence in opposition to a motion for summary judgment (§ 437c), appellants have failed to cite any authority for the proposition that it must consider evidence to which it has sustained an objection. To the extent that appellants assert that the requirement for broad construction should affect whether or not the trial court sustains an otherwise proper objection, they cite no authority for the point, and we consequently reject it. (*Roden, supra*, 155 Cal.App.4th at pp. 1575–1576.)

Habitat/Sage assert that there exist triable issues of material fact regarding the purpose and intent of the contracting parties because the evidence supports inferences that support their point of view. However, " '[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting

inferences may be drawn from [the] uncontroverted evidence.' [Citation.]" (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527 [117 Cal.Rptr.2d 220, 41 P.3d 46].) Appellants seem to assert that because the evidence could indicate different possible outcomes, summary judgment was not appropriate. They argue that the parties have a conflicting view of the intent and purpose of the Agreement.[6] However, they do not cite to any competent evidence in the record that supports their implied assertion that interpretation of the Agreement rests upon a credibility dispute. Rather, our review of the evidence indicates that there are no factual issues that remain for resolution, rather only the legal effect of the undisputed facts. Therefore, summary judgment was not improper. (*National Auto. & Cas. Ins. Co. v. Underwood* (1992) 9 Cal.App.4th 31, 36–37 [11 Cal.Rptr.2d 316].) In addition, the court in *Aguilar, supra*, 25 Cal.4th at pages 856–857, stated that a trial court must consider whether the inferences to be drawn from the evidence in opposition to a motion for summary judgment would be sufficient to convince the trier of fact that the burden of proof could be met. Based upon that holding, Habitat/Sage's premise on appeal, that the mere existence of conflicting inferences defeat summary judgment, is without legal support.

Habitat/Sage next argue that the trial court erred in finding that the Agreement could be rescinded on the ground of unilateral mistake because the evidence does not support the trial court's finding that performance of the Agreement would have been unconscionable. Although the trial court did list the factors for rescission of a contract based on unilateral mistake, we are not convinced that its analysis was based solely upon those factors. In the first instance, neither the cross-complaint nor the motion for summary judgment was based upon a claim of unilateral mistake. Rather, they both alleged mutual mistake. Consequently the trial court had no authority to decide the case based upon unilateral mistake principles. (*City of Morgan Hill v. Brown, supra*, 71 Cal.App.4th at p. 1121 [the pleadings govern the issues to be addressed].) Further, the trial court found that "all parties assumed that Habitat would be approved as a qualified conservation entity because it had been so designated in the past." This demonstrates a finding of mutual mistake was reached.

Habitat/Sage argue that the trial court's determination that enforcement of the Agreement would be unconscionable is not supported by the facts because there is no evidence in the record that the additional mitigation land would have been carved out of the land defendants intended to develop. However,

---

[6] They also argue that the trial court erred because it "granted summary judgment without truly weighing all of the contradictory evidence and reasonable inferences therefrom." Clearly they have forgotten that the role of the court in summary judgment proceedings is not to weigh the evidence, but to determine whether there exists a triable issue of material fact. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 879–880 [116 Cal.Rptr.2d 158]; *Garlock v. Cole* (1962) 199 Cal.App.2d 11, 14 [18 Cal.Rptr. 393].)

they have not shown that unconscionability is a necessary finding for the existence of mutual mistake and therefore have not demonstrated the existence of prejudicial error. In addition, we note that the trial court's conclusion regarding unconscionability as cited by Habitat/Sage was not part of its analysis regarding mistake.

■ Appellants next assert that the alleged mistake of fact involved a foreseeable prospective occurrence, not the past existence of a thing that has not existed or the present existence of a thing that does not exist as required by Civil Code section 1577, subdivision 2. They do this by altering the nature of the fact upon which the parties were mistaken. They claim the mistake was that City did not approve Habitat as a QCE to receive the mitigation land, an event that occurred months after the Agreement was entered. However, that was not the mistake alleged, nor the mistake found by the trial court. That mistake was that Henderson/SPS and Habitat/Sage, at the time of contracting, believed that Habitat would qualify as a QCE to receive the mitigation land. Unlike the *Mosher v. Mayacamas Corp.* (1989) 215 Cal.App.3d 1 [263 Cal.Rptr. 373], case cited by Habitat/Sage, where the facts showed not that both parties were mistaken at the time of contracting, but that one party simply failed to consider the possibility of a future event (*id.* at p. 5), the parties here were mistaken, at the time they entered the Agreement, as to the present fact that Habitat would qualify as a QCE. This fact was an assumption of the Agreement, a circumstance that the *Mosher* court recognized would have altered its analysis of the risks in favor of finding mistake. (*Ibid.*) " 'Where from the nature of the contract it is evident that the parties contracted on the basis of the continued existence of the person or thing, condition or state of things, to which it relates, the subsequent perishing of the person or thing, or cessation of existence of the condition, will excuse the performance, a condition to such effect being implied, in spite of the fact that the promise may have been unqualified.' " (*Johnson v. Atkins* (1942) 53 Cal.App.2d 430, 434 [127 P.2d 1027].) Habitat/Sage have failed to demonstrate the existence of a triable issue of material fact as to the affirmative defense or the cause of action for rescission based upon mistake.

Next, Habitat/Sage argue that the affirmative defense and cause of action for rescission based upon failure of consideration were not properly adjudicated because the issue of the materiality of the failed consideration is a question of fact, and not appropriate for resolution on summary judgment. They also assert that the consideration that allegedly failed was not within the power of Habitat/Sage to provide. And finally, they assert that there was no complete failure of consideration because Henderson/SPS received the

contracted-for benefit of Habitat/Sage's forbearance from suit and that complete rescission was therefore improper. None of these points were raised below as grounds for challenging defendants' and cross-complainant's showing. Although counsel for Habitat/Sage spoke to certain of these assertions regarding rescission at oral argument, he failed to address this fact and did not explain why this court should ignore it. Consequently, as before, we decline to consider these arguments for the first time on appeal. (*Richmond v. Dart Industries, Inc., supra*, 196 Cal.App.3d at p. 874.)

■ Habitat/Sage also complain that the trial court failed to give effect to the savings clause of the Agreement to sever those contractual terms that could not be enforced and to give effect to the remainder. The cases Habitat/Sage cite are inapt since they refer to illegal or legally unenforceable contract terms. That is not what we have here. Rather, the contract has been rescinded. The savings clause is simply a part of the contract, and since the effect of rescission is the extinguishment of the contract (Civ. Code, § 1688), the savings clause is of no effect. (*Tippett v. Terich* (1995) 37 Cal.App.4th 1517, 1535 [44 Cal.Rptr.2d 862], disapproved on another ground in *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 171, 175–178 [96 Cal.Rptr.2d 518, 999 P.2d 706]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 926, p. 1023 [rescission terminates further liability and demands restoration of parties to former positions as though contract never entered].)

■ Habitat/Sage's only argument concerning the second cause of action for breach of the covenant of good faith and fair dealing comes in a footnote, where they assert that the evidence supports an inference that Henderson/SPS's and Rancho's failure to convince City to find Habitat qualified was the result of a concerted effort to avoid their duties under the Agreement. Breach of the covenant of good faith and fair dealing is nothing more than a cause of action for breach of contract. (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49 [275 Cal.Rptr. 17].) In light of our discussion above, and appellants' failure to demonstrate that the trial court erred when it made the challenged orders, there is no contract to breach and this cause of action must fail.

Finally, the third appeal argues only that if the summary judgment in favor of defendants were reversed, then the order for attorney fees and costs should also be reversed. In light of the fact that appellants have failed to demonstrate that they are entitled to reversal of the judgment, the order for attorney fees and costs is affirmed.

## DISPOSITION

The judgments and orders in each of the three consolidated appeals are affirmed. Respondents are awarded their costs on appeal.

Ramirez, P. J., and McKinster, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 30, 2009, S175849.