Filed 4/29/14  Bennett v. Foss CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PETER BENNETT,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>CYNTHIA FOSS,<br><br>      Defendant and Appellant. | A137452, A138342<br><br>(San Francisco City & County<br>Super. Ct. No. FPT-09-376032) |
| CYNTHIA FOSS,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>PETER BENNETT,<br><br>      Defendant and Respondent. | A138448<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-11-513336) |

In these consolidated appeals, appellant Cynthia Foss appeals from the trial court's family law orders lowering respondent Peter Bennett's child support payments from $4,500 per month to $3,200 per month, and denying her Family Code[1] section 3557 requests for attorney fees and costs.  She also appeals from another trial court order ruling against her in a breach of contract action pertaining to the parties' postseparation settlement agreement.[2]  On appeal, Foss asserts the trial court erred in modifying child

---

[1] All statutory references are to the Family Code unless otherwise indicated.

[2] Appeal No. A137452 is taken from the denial of her motion for new trial on the child support matter.  Appeal No. A138342 is taken from the February 7, 2013 order denying Foss's fourth motion for attorney fees and costs.  Appeal No. 138448 is taken from the judgment for Bennett on the breach of contract claim.

support without properly finding that there had been a change in circumstances. She further contends the court unfairly limited her ability to conduct discovery into Bennett's finances, which also resulted in a flawed decision as to her attorney fee motion. Finally, she claims the court in her civil breach of contract action erroneously concluded that the parties' settlement agreement was unenforceable due to impossibility and failure of consideration. We agree the order modifying child support must be reversed. Because Foss has failed to state a proper basis for an award of attorney fees, however, we are unable to reverse the lower court's denial. As to the breach of contract claim, we concur with her claims of error, and reverse and affirm in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**I.** *Background*

Bennett and Foss are the parents of two daughters, one born in September 2000 and the other born in July 2002. The parties were never married, but lived together for over 10 years. Bennett is a marketing director for a debt buying and collection agency business. He owns the various business entities involved in this venture through a holding company called Bennett Capital Management LLC (BCM). Foss did not work outside of the home while the parties were together.

In 2009, Bennett filed a parentage action.

On October 9, 2009, the parties stipulated to have the matter heard by a private judge, Eileen Preville, appointed as a judge pro tem.

**II.** *Proceedings Before the Private Judge*

On April 21, 2010, after the parties engaged in settlement negotiations before Judge Preville, Bennett signed an "Enforceable Settlement Memorandum" (ESM).[3] The ESM is identified as "a judicially enforceable settlement pursuant to [Code of Civil Procedure section] 664.6." The ESM addresses the following issues: (1) child custody,

_____

[3] Foss signed the ESM on April 26, 2010.

2

(2) child support, (3) attorney fees and costs, and (4) a claim described as Foss's "*Marvin* Claim."[4]  Under the ESM, Bennett agreed to pay child support of $8,500 per month through August 31, 2010, at which time child support would reduce automatically to $4,500 per month.  He also agreed to pay "add-on child support" for (1) private school tuition; (2) medical insurance coverage and health care expenses; and (3) agreed-upon discretionary expenses, such as summer camp and extracurricular classes.

Also as part of the ESM, Foss agreed to transfer her interest in the parties' Vermont property to Bennett as a taxable sale, provided that he took actions to release her from any mortgage liability.  The parties agreed to jointly acquire a property in the Bay Area within 24 months for Foss and the children to reside in.  Bennett was to be responsible for the down payment on that home, as well as the monthly mortgage payments.  The parties also agreed to a schedule regarding child custody.  The ESM did not establish guideline child support payments, nor did it specify whether the amount the parties agreed upon was above or below the guideline amount.

On July 9, 2010, Bennett executed a notice of rescission of the ESM.  He stated several grounds for rescission, include lack of mutuality of promises, ambiguity, unfairness, lack of representation by counsel, coercion and duress, lack of consideration, and breach of the agreement by Foss.

On October 14, 2010, Bennett served an order to show cause regarding child custody, child visitation, child support, and attorney fees.  The hearing was to take place at Judge Preville's office.  In an accompanying declaration, Bennett requested orders allowing him equal coparenting time with his daughters.  He also asserted his business interests had suffered losses, reducing his income.  He claimed his annual salary was set to fall to $35,000 per year.  He noted he had previously paid Foss $8,500 per month in child support, but claimed he was only able to pay $3,650 for the current month.

---

[4] *Marvin v. Marvin* (1976) 18 Cal.3d 660 (*Marvin*).

3

Asserting he no longer had the ability to pay Foss's attorney fees and costs, he requested an order that the parties bear their own attorney fees and costs.

On June 2, 2011, Foss filed an income and expense declaration indicating that she had obtained work at about 24 hours per week at a pay rate of $18 per hour.

On July 8, 2011, the trial court granted Foss's motion to withdraw her stipulation to use a private judge. The parties agreed to have the case returned to the superior court's family law department following certain rulings by Judge Preville.

On July 11, 2011, Bennett filed an income and expense declaration stating his salary as a manager for one of his business entities was currently $3,000 per month.

On July 27, 2011, Judge Preville filed a judgment. The judgment recites that Bennett was to have paid Foss a total of $50,000 by April 30, 2011 to resolve any claims for child support add-ons and attorney fees and costs incurred through February 1, 2010. Consistent with the terms of the ESM, child support was set beginning March 1, 2010 in the amount of $8,500 per month, to be reduced to $4,500 beginning September 1, 2010. Bennett was also ordered to pay private tuition, medical expenses, up to $9,000 per year for elective activity add-ons, and up to $5,000 per year toward travel expenses associated with Foss's vacation travel with the children. A nonguideline child support findings attachment indicates that the parties disputed what guideline support would be, and also disputed whether the amount ordered was above or below guideline support.

In an order filed the same day granting a motion to enforce the ESM, Judge Preville addressed Bennett's purported repudiation. She found his claims of error to be lacking in credibility, particularly his claim that he did not have an opportunity to consult with counsel prior to signing the document.

On July 28, 2011, Judge Preville filed an order of recusal. She concluded the parties were not ready to proceed to hearing on the merits of various motions. She observed that "current counsel cannot even agree on how discovery requests should be served or whether existing orders have been complied with." The matter moved to the

4

superior court. We first address Foss's appeals of the trial court's child support modification order and the order denying her attorney fees.

### III. *Proceedings Prior to Child Support Modification Hearing*

On August 22, 2011, Bennett filed a motion to vacate and/or set aside Judge Preville's July 27, 2011 judgment.

On October 28, 2011, the trial court conducted a hearing on Bennett's motion. The court denied the motion to set aside the judgment. The court agreed that Bennett could maintain his October 2010 motion for modification of child support, notwithstanding Foss's attorney's protest that Bennett had not provided requested discovery concerning his finances. The court awarded Foss $2,000 in attorney fees and ordered Bennett to pay $3,500 per month in temporary child support. The court indicated "whether you have funds that are liquid or unliquid, sir, it's not only what your current earnings are—it's what you have in bank accounts, in stocks, things that are easily liquidated because, again, a child support order is an order of the Court and there's a current order." The court ordered the modification motion be heard on November 30, 2011. The court told Foss's counsel, "[T]o the extent that there are any witnesses or documents that you're not able to get by that time pursuant to, let's say, a deposition notice or production for documents, then we can discuss a second date. But we're going to start on the 30th with respect to that motion."

On October 31, 2011, Foss served Bennett with a request for production of documents. The pleading enumerates 16 separate requests.

On November 15, 2011, Foss filed her opposition to Bennett's motion for reduction of child support. She claimed he had not presented any evidence of his current financial status and had not yet fully complied with her discovery requests. As to the documents that had been provided, she asserted they were "woefully inadequate." In particular, she noted while his declaration asserted his salary had decreased, he did not disclose any nonsalary income or set forth the status of his other assets as they existed in

5

2009 and 2010. She also argued he was erroneously relying on the "discredited" case of *In re Marriage of Thomas* (1981) 120 Cal.App.3d 33 (*Thomas*) in arguing that he was entitled to have his child support adjusted based only on his current financial status, without the need to demonstrate changed circumstances dating from when he agreed to the ESM in April 2010.

On November 23, 2011, Bennett filed an income and expense declaration stating his monthly salary had dropped to $2,773.

## IV. *The Modification Hearing*

The child support modification hearing dragged out over a period of 10 months.

### A. *The Hearing Commences*

On November 30, 2011, the trial court denied Foss's request for a continuance based on Bennett's failure to produce certain financial information. The court appeared to concur with Foss's position that it was Bennett's burden of proof to show a change of circumstances had occurred since April 2010. The court anticipated the hearing would continue into another day to allow the parties time to address their discovery disputes and to give Foss's attorney an opportunity to file a motion to compel documents that he believed should be produced prior to the resumption of the hearing.

Bennett testified that his company BCM currently had negative equity. BCM owns Applied Income Sciences (AIS), which also had negative equity at that time. Another business entity, AIS Services, is the trustee for trusts that own debt along with various outside investors. AIS was profitable in the prior year. It had about a million dollars in gross revenues in 2010. Because his businesses had recently suffered losses, however, Bennett was personally compelled to make up for deficiencies resulting from unsuccessful investments. He had personally guaranteed a $500,000 loan for his companies. Additionally, aspects of his business had been mismanaged. In particular, after he signed the ESM he discovered $400,000 worth of unreported and unpaid business invoices. As a result, assets had to be sold to settle loans taken by AIS Services, leaving

6

the company with no assets. Without assets or access to loans, AIS could not continue to buy debt and stay in business. Since September 2010, AIS had gone down from about 20 employees to six.

Bennett had filed an income and expense declaration on October 15, 2010, stating that he was paid a gross salary of $4,167 for his work with AIS Services. At its peak in 2007, his salary was $100,000 per year. In April 2010, it might have been $50,000 per year. At the time of the instant hearing, he was earning double minimum wage, or about $35,000 per year. Additionally, he owned securities that had paid him about $1,000 per month. He had been selling them off over the last couple of years, and estimated he had sold over $200,000 worth of securities. When he negotiated child support in the ESM, he did not know there was a $400,000 hole in the company, or that he soon would be unable to attract investors to his business.

On December 20, 2011, Foss filed a motion to compel production of documents.

On January 10, 2012, the trial court filed its order denying Foss's motion for attorney fees and costs and her request for sanctions pursuant to section 271. The court concluded she had presented insufficient evidence to support a finding that Bennett had the ability to pay her attorney fees, based on his income and expense declaration stating that he currently received a salary of $2,773 each month while having monthly expenses of $10,154.

On January 12, 2012, the trial court denied Bennett's motion to quash a subpoena to First Republic Bank. On January 23, 2012, the trial court awarded attorney fees and costs in the amount of $1,585 to Foss for having to oppose the motion to quash.

**B.** *The Hearing Continues*

On January 23, 2012, the second day of the hearing on Bennett's child support modification motion was held. Foss's counsel again complained that he had not received documents responsive to his discovery requests. Further, many of the documents that were produced had been redacted or doctored. He claimed he needed the requested

7

documents in order to meaningfully prepare for further hearings in the case. The trial court allowed Bennett to introduce his accountant's testimony, but stated any document that had not already been shown to Foss's counsel would be excluded. The court also stated Foss would be able to call the witness back for cross-examination if necessary. James Bernath, Bennett's accountant, was then allowed to testify.

Bernath testified he had prepared Bennett's tax returns for the last 25 years. He also prepared Bennett's business tax returns. Bennett's 2010 return showed adjustable gross income was $186,322. An unfiled draft of his 2011 return showed an adjustable gross income of negative $46,000. The main reason for the difference between the two income figures was that all the investment funds Bennett had managed were closed out at the end of 2010. Subsequently, his investment assets had been depleted and his salary reduced. Bennett was also liable for approximately $500,000 to First Republic Bank, as well as for the mortgage on the parties' Vermont property. Bernath indicated that any distributions to Bennett from BCM would either flow directly as reinvestment into AIS, or be used for expenses. Some money was used to pay debts and fund the capital contributions that were needed to keep the entities alive. Other money was used for Bennett's personal family expenses. The tax returns themselves would reflect any distributions that were made to Bennett personally. Towards the end of the hearing, the trial court indicated it would determine whether any previously undisclosed documents should have been produced by Bennett prior to Bernath's testimony.

On March 5, 2012, the hearing on Bennett's motion resumed. On cross-examination, Bennett was presented with a document he had previously generated indicating $3.5 million in distributions from BCM were made to him personally from 2006 through 2009. He explained that distributions are transactions of capital and are unrelated to income. Bennett's personal account at First Republic Bank reflected that approximately $2.8 million was deposited into the account in 2010. In 2011, deposits totaling approximately $960,000 were made. Bennett explained that the money came

8

into his account because his line of credit required it. The money was not income. If it were income, he would have stated it in his income tax returns.

Bennett testified he had charged a total of $410,534 on his American Express credit card in 2010. He claimed the vast majority of the charges were business expenses. The American Express bill was paid for by reimbursements from his company. Most of the charges were related to legal fees paid to lawyers who were hired by AIS Services. Foss's attorney pointed out that Bennett indicated he had no assets in his November 2011 income and expense declaration. Bennett stated he did not include the value of the business in his declaration because the form required him only to list assets that could easily be sold. At the close of this hearing, Foss's counsel indicated that he was still trying to get more documents from Bennett, including Bernath's file and documents from the Royal Bank of Scotland. He complained again about being forced to try the matter while discovery was ongoing.

On March 22, 2012, the trial court ordered Bennett to provide his written consent for the production of his Royal Bank of Scotland accounts pertaining to Coutts & Co.

### C. *Foss's Accounting Expert*

On March 27, 2012, Lisa Jolicoeur, Foss's expert in financial forensic accounting, prepared an analysis of income available for child support. The report includes two Dissomaster report printouts reflecting the calculation of child support based on inputs of nontaxable income for 2011 of $773,000 and $458,000. These calculations resulted in child support payments of $10,237 and $6,457, respectively.

On March 28, 2012, Jolicoeur testified in court. She indicated she had reviewed Bennett's 2011 draft individual tax return and the supporting documents for that return. She also reviewed the 2011 entity tax returns for BCM, AIS, and AIS Services, as well as AIS Services's balance sheet and profit and loss statement for 2011. Additionally, she looked at a trial balance report, bank statements from Bennett's bank account, reconciliation summaries for those bank statements, and payroll information. The

9

$773,000 income figure in her report was based on what he had spent in 2011, as well as what he had received. The total amount that went into his account was $1,079,650. From there, she deducted for expenses that appeared to be business-related, leaving the $773,000 figure as his annual income.

At the conclusion of Jolicoeur's testimony on direct, Foss's counsel indicated that he had only able to present "a snapshot of the finances at this point in time." He stated she would need to do more work as he was still waiting for further documents, including those from the Royal Bank of Scotland. The trial court agreed the witness would be allowed to review the documents from the Royal Bank of Scotland if they were produced before her scheduled deposition, which was set for April 4, 2012. At this point, the court observed: "What should have been a very, very simple child support modification has evolved into an unwieldy morass of discovery."

On April 4, 2012, Foss filed a motion to compel Bennett's written consent for production of various foreign bank accounts. She alleged that in 2010 he had wired substantial amounts of money from a First Republic Bank account maintained by BCM to bank accounts held by Greenhill LLC and BCM Properties LLC.

On cross-examination on April 10, 2012, Jolicoeur testified that she did not take into account the premise that all of Bennett's liabilities - personal and business - are personally guaranteed by him and secured by his personal assets. She did not deem that concept to be relevant to her task, which was to show the court how much money was available to him. In her view, section 4058 states that if a party is funding his lifestyle by depleting his assets, the children are entitled to live at that same standard of living.

### D. *Bennett's Accounting Expert*

On April 16, 2012, Bennett's expert accountant, Steven Boyles, completed a rebuttal report. He asserted Jolicoeur had failed to utilize the appropriate definition of "income" in performing her analysis. In particular, he asserted "income" for child support calculation purposes *does not* include proceeds from loans or transfers of capital.

10

Based on his analysis, Bennett had *no income* available for child support purposes in 2011. For 2010, the income available for child support was approximately $190,000 or $218,000, depending on the treatment of depreciation as a necessary expenditure of the businesses.[5] Boyles testified that his definition of "income" is that which represents an increase in wealth. Based on that definition, he concluded Bennett had an income of zero for 2011. In his view, income for child support purposes does not include money that is just sitting in an account.

### E. *The Proceedings Conclude*

On April 17, 2012, the trial court ordered Bennett to produce the finalized K-1 2011 statements for four of his business entities as soon as they were completed. The court denied Foss's request to require Bennett to provide a written consent to disclose any more bank statements for accounts held in the Royal Bank of Scotland, indicating it had "more than enough" information to determine an appropriate support order.

On June 6, 2012, Foss filed a third motion for attorney fees and costs. She contended she had made the required showing that Bennett had sufficient income or assets to pay for both parties' attorney fees and costs. Further, she noted the trial court had stayed the production of additional bank statements from the Royal Bank of Scotland and First Republic Bank. In the event the court were to find the evidence to be insufficient, she requested the stay be lifted to allow her to present further proof. The motion was denied.

On June 8, 2012, the parties gave their closing arguments.[6] Foss's attorney noted the two stayed motions for documents based on transfers involving BCM Properties and Greenhill LLC. He indicated that almost $1 million had been transferred by Bennett to those accounts. He also reiterated his position that further discovery still needed to be

---

[5] We observe: "[d]epreciating an asset does not involve a reduction of cash available for child support." (*Asfaw v. Woldberhan* (2007) 147 Cal.App.4th 1407, 1425.)

[6] On this same date, the court ordered Bennett to consent to the production of documents subpoenaed from the Royal Bank of Scotland concerning Coutts & Co.

undertaken to get a full picture of Bennett's finances. Foss's attorney offered Bennett's final 2011 tax return. The court refused to allow the final return into evidence and refused to allow Jolicoeur to testify as to its import.

### F. *The Trial Court Rules*

On September 21, 2012, the trial court granted Bennett's motion to modify child support. In its written findings and order after hearing, the court indicated that the evidence presented by both parties throughout multiple days of hearing was "far from clear" and that the court "was never given a complete or accurate breakdown of all of the sources of financial capital and assets that [Bennett] appears to have access to in his businesses." It found evidence was lacking concerning documentation of his various business interests, including gross receipts and expenses. In its ruling, the trial court denied Foss's pending motions to compel the production of bank account records from Royal Bank of Scotland and First Republic Bank. While noting guideline support was $874 per month, the court set child support at $3,200. The court also denied Foss's request for attorney fees.

On October 15, 2012, Foss filed a motion for a new trial.

On November 19, 2012, the trial court denied Foss's motion for a new trial. The court found that because the parties had stipulated to the initial child support amount in the ESM, they had waived their right to challenge any modification of that award on the grounds that the guideline amount had not been previously determined.

On November 30, 2012, Foss filed a fourth motion for attorney fees and costs. The motion was supported by a declaration from Foss's attorney, including portions from Bennett's final 2011 tax return reflecting he had a total of $301,757 in foreign bank accounts, and had capital gains sales of $386,160 in 2011.

On February 7, 2013, the trial court denied Foss's attorney fee request. The court again found she had failed to present the court with competent evidence of Bennett's

12

financial resources to support a finding that he has funds available to pay for his attorney fees and her attorney fees as well.

## DISCUSSION

### I. *Standards of Review for Child Support Modification and Attorney Fees Orders*

"The standard of review for an order modifying a child support order is well established. '[A] determination regarding a request for modification of a child support order will be affirmed unless the trial court abused its discretion, and it will be reversed only if prejudicial error is found from examining the record below.' [Citations.] Thus, '[t]he ultimate determination of whether the individual facts of the case warrant modification of support is within the discretion of the trial court. [Citation.] The reviewing court will resolve any conflicts in the evidence in favor of the trial court's determination.' " (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1233-1234 (*Williams*), quoting *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 555-556 (*Leonard*).)

However, as the appellate court observed in *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282-283 (*Cheriton*), "the trial court has 'a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . .' [Citation.] Furthermore, 'in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]' [Citation.] In short, the trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support.' " Put another way, a trial court's failure to follow the law in setting support constitutes an abuse of discretion. Attorney fee awards in dissolution cases are also reviewed for an abuse of discretion. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1166.)

13

**II.** *The Order Modifying Child Support*

On appeal, Foss raises several issues with respect to the order modifying child support. She claims Bennett failed to establish a guideline child support figure for April 2010, and therefore failed to demonstrate that there had been a material change in circumstances sufficient to justify granting his motion to modify child support. She also asserts the trial court erred when it determined the parties had waived this predicate determination. She also argues that the trial court erred in failing to allow her to complete discovery before hearing the motion, and in refusing to allow her to complete discovery after the hearing had commenced. We agree.

**A.** *General Principles Regarding Child Support*

"California has a strong public policy in favor of adequate child support. [Citations.] That policy is expressed in statutes embodying the statewide uniform child support guideline. [Citation.]" (*Cheriton, supra,* 92 Cal.App.4th at p. 283.) In setting guideline support, courts are required to adhere to the principles set forth in section 4053, which include: (1) "A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life"; (2) "[b]oth parents are mutually responsible for the support of their children"; (3) "[e]ach parent should pay for the support of the children according to his or her ability"; (4) "[c]hild support orders in cases in which both parents have high levels of responsibility for the children should reflect the increased costs of raising the children in two homes and should minimize significant disparities in the children's living standards in the two homes"; and (5) "[c]hildren should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children." (§ 4053, subds. (a), (b), (d), (g), (f).)

To implement these policies, courts are required to calculate child support in accordance with the mathematical formula contained in section 4055. (*Cheriton, supra,* 92 Cal.App.4th at p. 284.) "Determining child support under the guidelines has been

criticized as a 'complex and unduly costly' process 'which requires the use of a computer and which is not understood by anyone, least of all the affected parties.' " (*Ibid.*) Nevertheless, adherence to the guideline is mandatory and the guideline amount of child support is presumptively correct. (See §§ 4055, 4057, subd. (a); *In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1359.) The trial court may not depart from the guideline except in the special circumstances enumerated in section 4057, which include the obligor parent's "extraordinarily high income," and cases where the "parties have stipulated to a different amount of child support under subdivision (a) of Section 4065." (§ 4057, subds. (b)(3), (b)(1).)

   **B.** *Agreements Regarding Child Support and Modification of Child Support*

   "The Family Code allows parents to make agreements pertaining to child support, but such agreements are always 'subject to [the] approval of the court.' [Citation.] Section 3651 governs the modification or termination of support orders, 'whether or not the support order is based upon an agreement between the parties.' [Citations.] Under the express terms of section 3651, 'all support orders, even those based upon the agreement of the parties, are modifiable prospectively, except spousal support orders that the parties have agreed may not be modified.' [Citation.] The provisions of an agreement for child support are 'separate and severable from all other provisions of the agreement relating to property and [spousal support]. An order for child support based on the agreement shall be law-imposed and shall be made under the power of the court to order child support.' " (*In re Marriage of Bodo* (2011) 198 Cal.App.4th 373, 386.)

   " 'If the parties to a stipulated agreement stipulate to a child support order *below* the amount established by the statewide uniform guideline, no change of circumstances need be demonstrated to obtain a modification of the child support order to the applicable guideline level or above.' [Citation.] Since there is no concomitant provision for stipulated child support orders *above* the amount established by the statewide uniform guideline, the ineluctable inference is that a 'change of circumstances' *must* be

15

demonstrated to obtain a downward modification of the child support order to the applicable guideline level or below.  In short, the statute lets either party ' "renege" on the stipulation at any time, and without "grounds," ' if the stipulated award is *below* the guideline amount [citation], but otherwise adheres to pre-guideline law and requires proof of changed circumstances to reduce a higher award.  [Citations.]  Each case stands or falls on its own facts, but the overriding issue is whether a change has affected either party's financial status." (*In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015, fn. omitted (*Laudeman*).)  One may not obtain a reduction of a generous stipulated support order simply because of a change of heart.  (*Id.* at p. 1016.)  "The burden of proof to establish that changed circumstances warrant a downward adjustment in child support rests with the supporting spouse." (*Leonard, supra,* 119 Cal.App.4th at p. 556.)

### C. *Bennett Failed to Establish Changed Circumstances*

Our review of the record on appeal reveals the parties did not make a declaration that must accompany a stipulated below-guideline child support order, nor did Judge Preville make the findings required for a child support order that is above or below guideline.  (§ 4065, subd. (a).)  Therefore, assuming the stipulated child support order of $4,200 per month was at guideline amount, a showing of changed circumstances was a necessary predicate to a downward modification of the child support order.  (*Cheriton, supra,* 92 Cal.App.4th at p. 298; §§ 3650-3693.)  The applicable inquiry, therefore, is whether Bennett established a change in circumstances between the time when the stipulated child support order was made (April 2010) and when Bennett filed his motion to obtain a modification of that order (October 2010).

Much of the proceeding below focused on events occurring after October 2010, and no evidence was presented to establish what guideline support should have been in April 2010.  Instead, the trial court's findings recite changes in Bennett's reported monthly income dating from October 2010 ($4,167) to January 2011 ($2,773) based on

16

his tax returns. Importantly, there is no indication that his monthly income was any different in April 2010 than it was in October 2010.

As noted above, at trial Bennett relied on *Thomas*, *supra*, 120 Cal.App.3d 33 in support of his argument that a trial court can modify a child support order based on current circumstances, without considering the circumstances on which the underlying order was based. He does not mention this case in his appellate brief, and we deem the argument waived on appeal. In any event, as Foss correctly observes, *Thomas* predates the adoption of the statewide guidelines, which occurred in 1992. The cases decided since that time require a showing of changed circumstances to modify a stipulated child support order. (*Williams, supra,* 150 Cal.App.4th at pp. 1235-1236; *Laudeman*, *supra*, 92 Cal.App.4th at p. 1015.) Where there is no evidence of the parties' finances at the time of the stipulated order, it is "impossible to determine from the record whether anything changed." (*Laudeman*, at p. 1016, fn. 5.) Although he could have done so, Bennett presented no evidence of the parties' financial circumstances at the time of the stipulated child support order. He thus failed to meet his burden of proof.

We also disagree with the trial court's conclusion that Foss had waived her right to challenge any modification of that award on the grounds that the guideline amount had not previously been determined. The July 27, 2011 judgment acknowledges that guideline was "disputed by the parties." The fact that the parties disputed what the guideline was does not translate into a concession that guideline would not have to be established on a future motion for modification of child support.

### D.  *Denial of Discovery Motions*

We also concur with Foss's position that she was unfairly denied access to relevant financial documents. "Although some informality and flexibility have been accepted in marital dissolution proceedings, such proceedings are governed by the same statutory rules of evidence and procedure that apply in other civil actions . . . ." (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1354.) We conclude the trial court deprived Foss

17

of her right to fully investigate Bennett's assets. Throughout the proceedings, the court gave Foss assurances that she would be allowed to complete discovery. Yet Bennett was able to resist disclosure of what appear to be relevant documents up until the court's final rulings. While the court based its denial of Foss's motions to compel on the ground that she had had ample opportunity to complete discovery into Bennett's assets, there is nothing in the record to support the court's implicit conclusion that Foss's counsel failed to act diligently in pursuing discovery. Instead, it appears Bennett's litigation strategy was at least equally responsible for the delay in securing the requested documents. For example, Bennett submitted heavily redacted versions of his bank statements, forcing Foss's counsel to then obtain the records via a third-party subpoena to the bank itself.

The records Foss sought to discover were clearly relevant. "Parental income is 'broadly defined' for the purpose of calculating child support under the statutory guidelines. [Citation.] Thus, '[s]ubject to certain statutory exceptions, which do not apply here, gross income "means income from whatever source derived . . . ." (§ 4058, subd. (a).) Although it specifically lists more than a dozen possible income sources, by the statute's express terms, that list is not exhaustive. [Citations.] Rather, the codified income items "are by way of illustration only. Income from other sources . . . should properly be factored into the 'annual gross income' computation." ' " (*Williams, supra,* 150 Cal.App.4th at p. 1237, italics omitted.)

Here, even the trial court's findings and order after hearing states, "[s]imply put, evidence was lacking concerning documentation of [Bennett's] various business interests, including gross receipts and expenses." After discussing evidence presented over the course of the hearing as to Bennett's alleged financial collapse, the court noted that "[w]ithout full financial data for the business, *it cannot be known whether there are any*

18

*expenses listed in these businesses that might be relevant for consideration as income for child support purposes*."[7]  (Italics added.)

At the same time, the trial court, in a footnote, denied two stayed discovery motions to compel the production of bank account documents from the Royal Bank of Scotland (which allegedly held subsidiary accounts for Greenhill LLC) and from First Republic Bank (account held by some BCM Properties LLC).[8]  As justification for the denials, the court found that Foss "has had ample opportunity both prior to the filing of [Bennett's] motion and during the pendency of the motion to complete discovery into [Bennett's] assets."  This statement overlooks the fact that Bennett initially failed to comply with discovery requests, forcing Foss to file motions to compel.  It also begs the question as to why Foss would have had any incentive to pursue discovery into Bennett's assets before he filed his motion to modify the stipulated support order.  The order also overlooks the fact that the court had assured Foss at the outset of the hearing that she would be allowed to complete discovery before the matter was decided.

The trial court also concluded it did not have the authority to consider Bennett's access to financial capital.  Yet the court crafted an award of more than three times the guideline support figure of $874 per month.  The $3,200 figure exceeds Bennett's total reported monthly income in 2012 by over $400.  The excess support was attributed to "the unique financial circumstances" of this case.  Clearly, even the court believed Bennett had access to funds apart from the income he had stated in his income and expense declarations.

---

[7] As Bennett is the owner of the business in question, there appears to be no reason why he cannot supply the needed information:  "A judgment based upon factual truth is a legitimate goal of any judicial proceeding. Neither the trial court, nor this court, know the true state of father's financial affairs."  (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 38.)

[8] According to Foss, in January 2010 and March 2010 Bennett transferred a total of $1 million split equally between these two accounts.  The point of discovery was to determine if these amounts still existed, and to learn if there were additional funds in those accounts.

In sum, we agree with Foss that the trial court abused its discretion by failing to follow applicable legal precedent in granting Bennett's motion to modify child support. While Bennett attempted to show his business was in disarray, there was essentially no evidence as to how his personal financial situation had changed between April 2010, when he signed the ESM, and October 2010, when he filed his motion to modify child support. There are no findings as to the parties' finances at the time of the stipulated child support order, which makes it impossible to determine from the record whether anything changed during the six months prior to the filing of Bennett's motion. Nor is it possible to quantify any changes that might have occurred. We do sympathize with the frustration the trial court judge must have felt given the protracted nature of these proceedings. However, in child support proceedings involving a wealthy parent, it is ordinarily relevant whether the parent may have rearranged or concealed assets or income in an effort to minimize his or her support obligations. (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1082-1083; *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 109.)

We further conclude that the error was prejudicial. Ordinarily, an error or defect at trial is not harmless when "there is a 'reasonabl[e] probab[ility]' that it affected the verdict." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) In this context, "a 'probability' . . . does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*College Hospital Inc. v. Superior Court*, *supra*, at p. 715, italics omitted.) Here, the trial court was not given complete documentary evidence to corroborate Bennett's testimony regarding his income and assets. The court did not consider his finalized 2011 tax records or other evidence Foss had sought to obtain, even though testimony was predicated on Bennett's financial circumstances. In view of the disparity between Bennett's claimed income and the movement of large amounts of money through his personal bank account, the inquiry into the status of these funds was crucial

20

to the merits of his motion. Accordingly, the order modifying child support must be reversed for a new trial.

## III. *The Order Denying Attorney Fees*

Section 3557 states, in pertinent part: "(a) Notwithstanding any other provision of law, absent good cause to the contrary, the court, in order to ensure that each party has access to legal representation to preserve each party's rights, upon determining (1) an award of attorney's fees and cost under this section is appropriate, (2) there is a disparity in access to funds to retain counsel, and (3) one party is able to pay for legal representation for both parties, shall award reasonable attorney fees to any of the following persons: [¶] (1) A custodial parent or other person to whom payments should be made in any action *to enforce* any of the following: [¶] (A) *An existing order* for child support. . . ." (Italics added.)

The trial court found Foss had failed to prove Bennett had the financial means to pay her attorney fees as well as his own. She now asks us to reverse the court's order on the basis that section 3557, "like Family Code section 2030, provides for an award of attorneys fees to create 'parity' between the parties and on a showing that one party cannot pay while the other party can." The problem with her argument is that this matter is not a child support enforcement proceeding. Section 3557 pertains to actions undertaken to enforce the parties' *existing* support order, as in an action to collect for child support arrears. The instant proceeding, however, concerns Bennett's motion to modify child support. Thus, Foss is seeking reversal on the basis of the trial court's failure to follow a statute that does not apply to her case. Accordingly, she has not supplied us with a proper legal argument that would allow us to consider her claim of error.[9] We now turn to her appeal of the trial court's ruling on her breach of contract claim.

---

[9] We express no opinion as to whether attorney fees may be recoverable under any other provision of law.

**IV.** *The Breach of Contract Action*

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) The trial court concluded Bennett was not in breach of the contract.

**A.** *Relevant Contract Provisions*

Paragraph 4F of the ESM (hereafter Paragraph 4F) provides, in relevant part: "On or before April 30, 2010, Ms. Foss shall transfer her interest in the Vermont property to Mr. Bennett as a taxable sale, based on his assumption of the bank loans (a loss), *provided that* he either refinances or obtains an assumption that releases Ms. Foss from the bank loans or otherwise takes her name off the mortgage for liability as well as credit reporting purposes." (Italics added.)

Paragraph 4I of the ESM (hereafter Paragraph 4I) provides: "Ms. Foss and Mr. Bennett shall acquire jointly a property within twenty-four months in the Bay Area for Ms. Foss and the children to reside in. The anticipated purchase price would be approximately $700,000. This would require 20% down, which when combined with closing costs, is likely to total about $150,000. Mr. Bennett would be required to raise that amount of money between now and the middle of next summer. Title and the loan would be taken jointly with Ms. Foss qualifying as a resident of the property for purposes of interest rate. The title instrument would be a tenancy in common deed, which would reference their written contract of ownership for purposes of determining their respective rights to the property." If the parties were to be unable to qualify for a loan to acquire the house within the 24-month time frame, Bennett was to pay Foss $375,000 as the alternative to the house purchase. Other provisions require Bennett to pay Foss's health insurance premiums for up to two years, and to give her access to a London timeshare.

**B.** *Procedural History*

On June 9, 2011, Foss filed a complaint for breach of oral contract, claiming she had not been paid monthly payments of $15,000 as promised by Bennett.

On November 13, 2012, Foss filed a motion to amend her complaint to add a second cause of action for breach of the ESM. In this claim, she asserted Bennett breached the parties' agreement by (1) failing to remove her from the loan for the Vermont property; (2) failing either help her purchase a home in San Francisco or, alternatively, to pay her $375,000; (3) failing to pay for her health insurance; and (4) failing to give her access to his London timeshare. The motion to amend the complaint was granted.

A bench trial was conducted over two days in November 2012.[10]

On December 24, 2012, the trial court issued its tentative decision and proposed statement of decision.

On January 10, 2013, the trial court filed its statement of decision. The court found that without the Vermont transfer of interest, there was a failure of consideration. The court also found that the provision requiring Foss to transfer her interest in the Vermont property by April 30, 2010, only four days after she signed the ESM, rendered performance impossible as Bennett would not be able to refinance or otherwise secure an agreement from the lender by that time. The court found the money from the sale of the Vermont property was material consideration for the agreement as a whole and, specifically, to the obligation to buy the Bay Area property. Accordingly, the court concluded Bennett did not breach the agreement by failing to buy the Bay Area property or by failing to pay her the alternate lump sum. The court also found that Foss failed to establish her claims regarding the health care premiums and the London time share.

On January 24, 2013, Foss filed a motion for new trial.

_____

[10] There is no reporter's transcript in the record on appeal for the first day of trial.

23

On February 7, 2013, judgment for Bennett was filed.

On March 22, 2013, the trial court denied the motion for new trial.

## C. *Standard of Review*

It is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Here, where the evidence is undisputed[11] and the parties draw conflicting inferences, we will independently draw inferences and interpret the ESM. (*Id.* at p. 866, fn. 2.) We are guided by the well-settled rules of interpretation of a contract, endeavoring to effectuate the mutual intent of the parties as it existed at the time of contracting insofar as it is ascertainable and lawful. (Civ. Code, § 1636; *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730 (*Ticor*).)

"As a rule, the language of an instrument must govern its interpretation if the language is clear and explicit. [Citations.] A court must view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph, strict construction approach' [citation]. If possible, the court should give effect to every provision. [Citations.] An interpretation which renders part of the instrument to be surplusage should be avoided." (*Ticor, supra,* 177 Cal.App.3d at p. 730.) " 'Interpretation of a contract "must be fair and reasonable, not leading to absurd conclusions." ' " (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521.)

## D. *Impossibility*

As noted above, the trial court found Paragraph 4F created an impossibility, as it would not have been possible for Bennett to take Foss off the mortgage in the short span of time set forth in the provision. " ' "A thing is impossible in legal contemplation when

---

[11] It is undisputed that (1) Foss did not assign her interest in the Vermont property to Bennett; (2) Bennett did not remove her from the mortgage on the Vermont property; (3) he did not purchase a home in the Bay Area; and (4) he has not paid Foss the $375,000 as provided in the agreement.

it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." [Citation.]' [Citation.] This does not mean that a party can avoid performance simply because it is more costly than anticipated or results in a loss. [Citation.] Impracticability does not require literal impossibility but applies when performance would require excessive and unreasonable expense." (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1336.) Foss notes the ESM does not contain a "time is of the essence" clause, and therefore asserts the prospect of delay did not create an impossibility within the meaning of Civil Code section 1597.[12]

"Where the contract does not contain a provision that time is to be of its essence, defendants rights are defined in section 1492 of the Civil Code." (*Smith v. Blandin* (1901) 133 Cal. 441, 444-445.) Section 1492 provides: "Where delay in performance is capable of exact and entire compensation, and time has not been expressly declared to be of the essence of the obligation, an offer of performance, accompanied with an offer of such compensation, may be made at any time after it is due, but without prejudice to any rights acquired by the creditor, or by any other person, in the meantime." Thus, it does not appear that the contract itself created an obstacle to Bennett securing alternate financing within a reasonable time after April 2010. Nor did it preclude Foss from thereafter signing over her interest in the Vermont property to Bennett.

We also note that the plain language of this provision makes Foss's performance contingent on Bennett removing her from the mortgage. At a minimum, it does not require her to sign over her interest in the property *before* she is removed from the mortgage. Further, there is nothing in the record to suggest Bennett was prejudiced by Foss's failure to sign her interest in the property over to him by the date in question. In other words, Foss's failure to sign the property over to Bennett by April 30, 2010 had no

---

[12] Civil Code section 1597 defines impossibility as follows: "Everything is deemed possible except that which is impossible in the nature of things."

practical effect on his interests, as he did not have a potential buyer at that time.[13] Accordingly, the trial court erred in concluding Bennett had established the affirmative defense of impossibility based on the language of Paragraph 4F.

### E. *Consideration*

As noted above, the trial court also found that the failure to transfer the Vermont property amounted to a failure of consideration because the purchase of the Bay Area home was contingent on a sale of the Vermont property. As Foss correctly notes, however, there is nothing in the language of the ESM that requires the Vermont property to be sold or that makes its sale a condition precedent to Bennett's obligation to purchase a home in the Bay Area. Instead, the ESM speaks only of a "transfer" of Foss's interest in the Vermont property, to be preceded by Bennett obtaining an assumption of the loan.

The trial court's statement of decision itself acknowledges this: "I agree with Foss . . . that the ESM does not expressly state a quid pro quo as between the Vermont and Bay Area properties, such that the Vermont transfer must go through before the Bay Area Property can be purchased." Yet the decision goes on to endorse Bennett's position that he was not required to perform by stating: "First, it would be inequitable to force Bennett to buy the $700,000 Bay Area Property (or pay what is in effect liquidated damages of about half that sum[]) without the sale of the Vermont Property. Secondly, even without an express quid pro quo terminology, and without an expression that the Vermont sale is a condition precedent to the Bay Area purchase, I find that without the Vermont transfer there is a failure of consideration. That is, without the Vermont transfer, Bennett does not obtain a substantial part of the consideration which he expected.[] It is no coincidence that [] the value of the Vermont Property and of the expected value of the Bay Area Property were so close." In our view, the trial court here makes assumptions -

---

[13] Bennett submitted evidence that a "short-sale" was offered to Foss in November 2011.

26

and posits scenarios and consequences - that do not flow from the language of the contract itself.

As to the first point, whether it is "inequitable" to force Bennett to buy the Bay Area property or pay the lump sum to Foss without the sale of the Vermont property, we note there is nothing in the contract to suggest that the Vermont property is to be sold at all. In particular, we note Paragraph 4F also provides that Foss "shall be allowed reasonable use for herself and the children for vacation purposes at no cost for as long as Mr. Bennett owns the property, unless the property is rented out or otherwise being used by Mr. Bennett." From this provision, we gather that the parties contemplated Bennett could choose to retain the property at his own election. Thus, Foss's obligation to assign her interest in the property to Bennett exists independent of any subsequent sale of the property. If the parties deemed a sale to be of the import suggested by the lower court, doubtless language signifying such would have been inserted into the contract.[14]

"Strictly speaking, '[f]ailure of consideration is the failure to execute a promise, the performance of which has been exchanged for performance by the other party.' " (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 398.) Additionally, "It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance." (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380.) Thus, "[o]ne who himself breaches a contract cannot recover for a subsequent breach by the other party." (*Silver v. Bank of America* (1941) 47 Cal.App.2d 639, 645.) However, the breach of an independent covenant in a contract does not excuse the performance of another independent covenant. (*Verdier v. Verdier* (1955) 133 Cal.App.2d 325, 334.) "The

---

[14] That the parties did not contemplate a direct relationship between the two real properties is further evidenced by the fact that the provision relating to the Vermont property (Paragraph 4F) is separated from the provision relating to the Bay Area property (Paragraph 4I) by two provisions of the contract. Paragraph 4G of the ESM pertains to the London timeshare, and paragraph 4H pertains to a provisions requiring her to relinquish her membership at Dorset Field Club.

determination of whether a promise is an independent covenant, so that breach of that promise by one party does not excuse performance by the other party, is based on the intention of the parties as deduced from the agreement." (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 279.) "To construe covenants as dependent is to work a forfeiture as to one party, and no obligation of a contract is to be regarded as a condition precedent unless made so by express terms or necessary implication. Where a breach is partial and is 'capable of being fully compensated,' the strong tendency is to regard it as insufficient to constitute a defense." (*Verdier v. Verdier*, *supra*, at p. 334.)

In the present case, the court found "[a] material failure of consideration, abetted by impossibility, thusly undermines Foss's claim that Bennett breached by not buying the Bay Area Property." Apparently, the court found Foss's conduct in failing to assign her interest to Bennett constituted a material breach of the ESM, thereby excusing Bennett's performance. Just as easily, however, we could conclude that Bennett's failure to obtain alternate financing constituted a material breach such that Foss's duty to sign over her interest in the Vermont property was excused. (See, e.g., Civ. Code, § 1439 ["Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must be able and offer to fulfill all conditions concurrent so imposed upon him on the like fulfillment by the other party . . . ."].) Further, as the agreement provides that Bennett's obligation was to occur *prior* to Foss's obligation, the facts themselves do not support the trial court's ultimate finding. Further, even if she did breach her duty to sign over her interest in the Vermont property, there is nothing in the language of the ESM that would thereby excuse Bennett from his obligation to purchase a Bay Area property for Foss.

### G. *Other Issues*

The parties devote much of their briefing to discussing Foss's first cause of action for her verbal *Marvin* claims. The trial court explicitly declined to rule on those claims,

28

and, as a result, there is no ruling from which Foss can appeal.[15] Accordingly, we decline to address this aspect of the parties' contentions. In any event, as we are reversing the judgment, the issue is moot.

Bennett contends any issue regarding the London timeshare was adjudicated in the family court on January 27, 2011. He also asserts Foss failed to prove her claim below as to the unpaid health insurance premiums. In its statement of decision, the trial court indicated that Foss did not establish that she had been refused the use of the London apartment. The court also found she failed to show any gaps in healthcare coverage at trial. As the record on appeal does not contain a reporter's transcript of the parties' testimony on the first day of trial, we are unable to evaluate whether the trial court erred in this respect. A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. (*Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 156.) Accordingly, that aspect of the court's ruling cannot be challenged on appeal. For the same reason, we are unable to evaluate her claim regarding the unpaid health insurance premiums.

## DISPOSITION

The trial court's ruling on Bennett's child support modification request is reversed. The matter is remanded to the trial court with directions to conduct a new hearing consistent with the principles set forth in this opinion.

The trial court's ruling on Foss's breach of contract claim is also reversed with respect to the ruling regarding Bennett's obligation to purchase a Bay Area property and

---

[15] The court's statement of decision states, in pertinent part: "It is true that the trial dealt only with Foss'[s] allegation that Bennett breached the written ESM, but I was not presented with and did not rule on any formal request for bifurcation, and I express no opinion on whether for example the statute of limitations bars enforcement of the oral agreement . . . or whether, having elected to proceed on the written agreement and seeking judgment on it, o[r] for other reasons, Foss is otherwise barred from protecting on the oral claim."

his alternative duty to make the $375,000 payment to Foss. The ruling is affirmed as to the alleged nonpayment of Foss's health insurance premiums, as well as the alleged denial of access to the London timeshare. The parties are to bear their own costs on appeal.

 

_____
Dondero, Acting P.J.


We concur:


_____
Banke, J.


_____
Becton, J.[*]

---

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.